[No. 28459. Department Two. December 26, 1941.]

C. L. QUIST, SR., *et al., Respondents,* v. CASPER ZERR, *Defendant,* VINCENT ZERR, *et al., Appellants.*[1]

[1]Reported in 120 P. (2d) 539.

*Roberts, Swanson & Tunstall,* for appellants.

*D. V. Morthland* and *Lane Morthland,* for respondents.

JEFFERS, J.—This action was instituted by C. L. Quist, Sr., C. L. Quist, Jr., and Austin H. Quist, doing business as C. L. Quist & Sons, a copartnership, against Casper Zerr, Vincent Zerr and Elizabeth Zerr, his wife, in the superior court for Yakima county, to recover damages claimed to have resulted from the breach of a contract. We quote three paragraphs of the complaint, in order that our subsequent references thereto may be better understandable.

"3. That heretofore and on or about the 14th day of April, 1939, the plaintiffs, at the special instance and request of the defendants, sold and subsequently de-

livered to said defendants certain goods, wares and merchandise, to-wit, gasoline service station equipment, more particularly described in Exhibit 'A' attached hereto and by reference made a part hereof. That the agreed price and reasonable value of said equipment was the sum of $282.08."

(The equipment above referred to and as set out in the exhibit consisted of one 550 gal. 14 Ga. gasoline tank; one 3½ by 1½ by 1½ D. T. bushing; one 1½″ D. P. foot valve; one Tokheim computing gasoline pump, model 39, type VP serial number 813377.)

"4. That the sale of the equipment aforesaid was evidenced by a written memorandum of conditional sale, a copy of which is attached hereto, marked Exhibit 'A' and by reference made a part hereof. . . .

"5. That among other provisions, said memorandum of conditional sale contained the following covenant and agreement, to-wit:

" 'And as further consideration, the vendee or his assigns and heirs, agrees to purchase all requirements of petroleum products sold on the above premises from the vendor, their assigns or heirs. This agreement will not expire sooner than May 31, 1943, regardless of the fact that the above mentioned articles sold may be fully paid before that date. The vendors agree that the price charged for petroleum products will conform with the prices charged by other major oil companies to dealers of a like category.' "

While in the briefs it is stated that defendants Vincent Zerr and Elizabeth Zerr and defendant Casper Zerr filed separate answers, the only answer appearing in the record before us is that of Vincent and Elizabeth Zerr. This answer consists of a denial of the allegations of the complaint, for the most part on information and belief, and a further answer wherein all the grounds for a demurrer are set out.

The cause was tried to the court without a jury. At the close of the testimony, the court made and filed its memorandum opinion, wherein it expressed the

opinion that the complaint should be ordered amended to conform to the proof, and on February 1, 1941, the court entered an order that the first cause of action, which is the only one with which we are concerned on this appeal, be amended by adding the following paragraph:

"That during the negotiations leading up to the contract aforesaid and at the time said contract was signed the defendant Casper Zerr was the agent of the defendant Vincent Zerr and Elizabeth Zerr, husband and wife, and was duly authorized and empowered to conduct all negotiations leading up to the formation of said contract for and on behalf of defendants Vincent Zerr and Elizabeth Zerr and to execute said contract for and on behalf of said defendants Vincent Zerr and Elizabeth Zerr and that the said defendant Casper Zerr did in fact conduct said negotiations and did execute said contract for and on behalf of said defendants Vincent Zerr and Elizabeth Zerr. That subsequent to the execution of the contract hereinbefore mentioned the defendants Vincent Zerr and Elizabeth Zerr, husband and wife, with full and complete knowledge of said contract and all of the terms and conditions thereof, did ratify and confirm said contract and all of the terms and conditions thereof."

Motions for judgment notwithstanding the decision of the court, or in the alternative for new trial, were made and denied, and thereafter, at the request of counsel for defendants, the court reopened the case for the purpose of taking additional testimony, no limitation being placed by the court on the scope of such testimony.

After considering the additional testimony and the arguments of counsel, the court made and entered findings of fact, conclusions of law, and judgment in favor of plaintiffs.

The court, in addition to finding that on April 14, 1939, plaintiffs, at the special instance and request of defendants Vincent Zerr and Elizabeth Zerr, sold and

delivered to defendants goods, wares, and merchandise, to wit, gasoline and service station equipment, at the agreed price and reasonable value of $282.08, found that the sale of such equipment was evidenced by a written memorandum of conditional sale, which contained, among others, the covenant hereinbefore set out; that the contract was signed by defendant Casper Zerr, who, at the time of signing such contract, was acting as the duly authorized agent of defendants Vincent and Elizabeth Zerr, for the purpose of negotiating and executing such contract, and that the contract is the contract of Vincent and Elizabeth Zerr. The court also found that, subsequent to the signing of the contract, defendants Vincent and Elizabeth Zerr ratified the terms and conditions of the contract; that, notwithstanding that plaintiffs were at all times ready, willing and able to perform all parts of the contract, and repeatedly tendered to defendants Vincent and Elizabeth Zerr their requirements of petroleum products, in accordance with the contract, defendants, on or about September 1, 1940, breached such contract by wrongfully failing and refusing to purchase their requirements of petroleum products sold on the premises described in the contract, although defendants are now and were at all times mentioned in the complaint operating the business of selling gasoline and petroleum products at retail on the premises.

The court further found that, during the period the contract was performed by the defendants Vincent and Elizabeth Zerr, the average amounts of gasoline purchased per month from the plaintiffs were as follows: Hi-Octane 1,828 gallons, Ethyl 49 gallons, third grade 491 gallons; that, but for the breach of the contract by the defendants, plaintiffs could and would have sold to defendants, during the remainder of the term of the contract, at least 60,324 gallons of Hi-

Octane, 1,617 gallons of Ethyl, and 16,203 gallons of third grade; that the profit made by plaintiffs on each gallon of gasoline sold is 1¾ cents for Hi-Octane and Ethyl, and 1½ cents on third grade; that, by reason of the breach of the contract, plaintiffs have been damaged, through loss of sales of gasoline, in the sum of $1,193.26.

Judgment in favor of plaintiffs was entered for the above amount, plus an attorney's fee of $150, and costs. Defendants Vincent and Elizabeth Zerr have appealed from the judgment.

Error is assigned on the refusal of the trial court to grant judgment in favor of defendants notwithstanding the decision of the court, or in the alternative for a new trial, and in assessing the amount of the judgment.

From the testimony, it appears without dispute that C. L. Quist & Sons was and is engaged in the distribution of petroleum products for Richfield Oil Corporation, in the city of Yakima and the surrounding territory, as a part of the partnership business, and that C. L. Quist, Jr., was the manager of the Yakima operations.

It also appears from the undisputed testimony that Quist & Sons at all times mentioned had a contract with Richfield Oil Corporation, under which contract the oil company consigned to the partnership its products, consisting of gasoline, grease, etc., and Quist & Sons sold and delivered these products to the various service stations in that territory; that these products at all times remained the property of the oil company until sold and delivered by respondents; that all money received by respondents from such sales was deposited in the bank to the credit of the oil company, and such money did not go through the books of the partnership; that, for its services in handling these products, re-

spondents received a straight commission of 1¾ cents a gallon on all Hi-Octane and Ethyl gasoline sold and delivered, and 1½ cents a gallon on all third grade gasoline sold and delivered, and a check was given to respondents once a month by the oil company, based upon the gallons sold and delivered the preceding month; that, during the time herein mentioned, respondents had about thirty accounts to whom they were delivering gasoline.

C. L. Quist, Jr., testified that, when the Zerr account was taken on, no additional employees or equipment were required to handle the business; that, because of the location of the Zerr station and the further fact that the respondents required a certain number of employees to handle the business they had, no additional overhead was incurred in handling the Zerr account; that therefore the commission they received from the oil company for the gasoline sold to the Zerr station was practically clear profit, and when the Zerrs refused to continue to buy from them, they lost that profit.

The amount of gasoline sold and delivered to the Zerr station is shown by the exhibits and testimony for each of the sixteen months during which respondents sold and delivered to appellants gasoline of the Richfield Oil Corporation, and is not disputed; nor is it disputed that the average amount of gasoline used by the trial court in determining the loss of profits to respondents for the thirty-three months of the contract remaining, was the average amount of gasoline sold and delivered to appellants during the sixteen months the contract was in force.

It appears from the testimony of C. L. Quist, Jr., that he first talked to Vincent and Casper Zerr about furnishing them gasoline about March, 1939, at which time the Zerrs were building the station here involved.

It is not disputed that this station has at all times been and is now the property of Vincent Zerr and wife, and that, during the times herein mentioned, it was being operated either by the son, Casper Zerr, or by both Vincent and Casper Zerr.

It further appears from the testimony of this witness that the Zerrs needed a certain amount of equipment for their station, and inquired whether or not respondents would sell it to them on long terms; that this conversation was with both Vincent and Casper Zerr. It further appears that this witness told the Zerrs they could have as much time as they liked to pay for the equipment, but that respondents were not primarily interested in financing such deals, but were interested in securing an outlet for the sale of gasoline; that respondents would not be interested in financing this deal for the equipment, based on payments of $7.50 a month, unless they could get a contract under which appellants would purchase from respondents all the required gasoline at their station for the length of time the contract was to run.

At this time, Vincent Zerr had another station which he was operating about a block from the one in question. It appears that, at sometime during the first part of the negotiations between respondents and appellants, Vincent Zerr stated that he would not at that time be willing to sign a contract for a long time period. However, the negotiations continued, and Vincent Zerr thereafter told Quist, Jr., that Casper was going to run the new station, and that he (Quist) would have to do business with Casper; that, if Casper wanted the products sold by respondents, at the terms under which respondents would sell them, that was all right with him.

It further appears from the testimony of this witness that thereafter he talked mostly with Casper;

that, after Vincent Zerr had told him to take up with Casper all matters pertaining to the sale of equipment and the products to be used at the station, and after the contract had been prepared, this witness took the contract to Casper, telling him it was a conditional sales contract for the equipment, and explaining the terms of payment as agreed upon, and the clause relative to the future purchase of petroleum products from respondents; that Casper read the contract and signed it on April 14, 1939, and thereafter respondents delivered to appellants, at this station, all the gasoline required by them up to about September 1, 1940, when appellants refused to take any further deliveries of gasoline from respondents.

Alvin B. Martin, a salesman for the Richfield Oil Corporation, testified that he assisted C. L. Quist, Jr., in soliciting the business of the Zerrs, and was with Mr. Quist on some of the occasions when Quist talked to Vincent and Casper Zerr. It appears from the testimony of this witness that the oil company takes a separate contract from the service stations buying their products, this contract being separate and distinct from any contract made between the operators of the station and the person or persons who actually deliver the gasoline. It further appears that the company obtained at this time a sales contract and a painting agreement. This witness stated that Vincent Zerr told him that Casper was going to be the operator of the station, and that all dealings should be with Casper, as far as the signing of papers was concerned; that Vincent Zerr made the foregoing statement when the witness was at the service station with Quist, Jr.; that, because of such statements, the witness thereafter dealt with Casper Zerr; that, in so far as his own papers were concerned, that is, the company's sale contract and the painting agreement, he had them in

his hand when he talked to Vincent Zerr, and the latter said: "Well, you have Casper sign it;" that Casper Zerr signed his contracts, and Vincent's name does not appear thereon.

This witness further testified that he had a conversation with Vincent Zerr at the station about two weeks before appellants refused to take any more gasoline from respondents, and at that time Vincent Zerr stated to him that he was going through the books about six months prior to that time, and found the contract here in question; that Zerr asked the witness if he had ever seen the contract, and the witness said "No," whereupon Zerr said, "Here it is, read it."

It further appears that, about two weeks prior to the time appellants refused to accept any further deliveries of gasoline from respondents, Vincent Zerr went to the office of respondents and paid up the balance due on the purchase price of the equipment.

Vincent Zerr denied that he told Quist, Jr., to deal with Casper, and that whatever they did would be satisfactory to him, and denied that he ever authorized Casper to sign such an agreement, or that Casper had authority to sign such an agreement. Vincent Zerr testified that Casper had authority only to sign the gas bills and oil bills coming in, but no contract.

Casper Zerr testified that, while he read part of the contract, he did not understand the provision about agreeing to take gasoline from respondents until 1943. However, he did admit that he saw the clause in the contract, although, as we have stated, he said he did not read it, or all of it at least.

In our opinion, the testimony of Casper himself shows that he had full control of the station, and it further appears that such control was agreed to by his father, at least up until about six months before the contract was terminated, at which time Vincent

Zerr sold his other station and took a more active part in the operation of the station in question. It appears without dispute that, at least before Vincent Zerr sold his other station, Casper signed for all gasoline delivered at this station, paid all bills out of the receipts of the station, and generally exercised control of the station. It further appears that the license to operate the station was taken out in the name of Casper Zerr. It also appears that Vincent Zerr frequently checked the accounts of the station, and it does not appear that he at any time made objection to any acts of Casper in its operation.

Appellants introduced testimony to show that the commission paid by the oil company to respondents was not all profit, as it cost at least a cent a gallon to sell and deliver gasoline. None of the witnesses so testifying was familiar with the business of respondents, and could not and did not testify as to what costs or overhead respondents had.

It will, of course, be noticed that there is a conflict in the evidence as to whether or not Casper was authorized to sign the contract, or perhaps as to the conversations which form the basis for respondents' contention that Casper was so authorized. It is evident, from the memorandum opinion, that the trial court gave more weight to the testimony of respondents than to appellants' testimony.

Appellants contend and argue under their first assignment of error that the clause in the contract relative to the purchase of petroleum products from respondents does not obligate them to continue the operation of the gas station for the full time of the contract, but that they are obligated to purchase only such products as may be vended on the premises during the term of the contract, further arguing that there was nothing to prevent them from changing the

character of the business for which the premises were used, such as to the operation of a grocery store, or they might move the station to another location. In other words, appellants say that all respondents have on which to base a claim for damages is a hope that appellants will continue in the gasoline business at this location. Appellants then contend that respondents are not entitled to damages from the time of the claimed breach, up to the time of filing the complaint, or for damages for the balance of the term of the contract, based upon future profits, citing 15 Am. Jur. 558, § 150 *et seq.*; *Federal Iron & Brass Bed Co. v. Hock*, 42 Wash. 668, 85 Pac. 418; *Bogart v. Pitchless Lumber Co.*, 72 Wash. 417, 130 Pac. 490.

We cannot agree with the conclusion reached by appellants. The contract had been in effect some sixteen months, at the time of the claimed breach, and at the time this case was heard, appellants were selling petroleum products from the station. It does not appear that appellants had ever contemplated that this station would be discontinued; certainly no such claim was made by appellants during the trial of the action.

We are unable to agree that appellants may justify the breach of this contract by now arguing that they may sometime in the future discontinue this service station. Conceding only for the purpose of this argument that appellants are bound to purchase the products of respondents only as long as petroleum products are sold from the station, and that appellants are not bound by the contract to continue to purchase their needs of petroleum products from respondents for the full term of the contract, still we are of the opinion it would be necessary for appellants to make at least some showing that the station would be discontinued; and no such showing was made, or attempted to be made.

The authorities cited by appellants are to the effect that, to warrant a recovery for loss of profits in actions either for breach of contract or for tort, such loss of profits must be capable of proof with reasonable certainty. We are unable to see how either the *Bogart* or *Federal Iron & Brass Bed Co.* case, *supra,* aids appellants. In the *Bogart* case, we expressly stated that this court is committed to the doctrine of allowing prospective profits. We also stated that such profits do not have to be accurately shown, but that they may be determined from a consideration of all the tangible evidence upon the subject. We also, in the *Federal Iron & Brass Bed Co.* case, recognized that future profits are recoverable under certain conditions, for we therein stated:

"Ofttimes in the breach of a contract of this character, the only damages sustained are those of future profits. These may be of a substantial character in contemplation of law, and such as the injured party should be entitled to recover from the party who has without justification broken the contract. The recovery must, of course, be limited to the amount which from all the surrounding conditions may be deemed to have been reasonably certain had the breach not occurred."

We are satisfied that in the instant case there was evidence from which the trial court could have found that it was reasonably certain that appellants, to meet the demands of the station, would continue to require at least the amount of gasoline purchased from respondents during the time appellants purchased gasoline under the contract. We are also of the opinion that the evidence of past sales, considered with the evidence of the probability of future demands, was the best evidence obtainable in this case, and formed a proper basis for the judgment of the trial court.

It may be here stated that appellants at no time claimed that respondents had not done all that was required of them under the contract. Some inkling of the real reason why appellants discontinued purchasing from respondents may be found in the fact that, while appellants are being billed for gasoline by the company from whom they are now purchasing petroleum products, at the same price they paid respondents for Richfield products, it appears that appellants are now getting a rebate of so much per gallon.

It is next contended by appellants that the trial court did not use the proper method in determining the damages, if any, suffered by respondents, in that it did not deduct any cost or expense of operation, and that the court should have at least deducted from the commission an amount equal to one cent a gallon, as a reasonable and necessary expense of operation. We have already referred to the testimony of appellants on this question. C. L. Quist, Jr., testified to the effect that, in view of respondents' operation, the addition of the Zerr station did not increase their cost of operation or overhead; that, after taking the Zerr account, they did not require any additional trucks or equipment. The testimony of Mr. Quist is specific that the commission received for the sale and distribution of gasoline to .the Zerr station was practically clear profit to respondents, and the trial court so found, as appears from the fact that, in allowing damages, the court used as a basis the commission received by respondents, without making any deduction therefrom.

While at first blush there would seem to be merit in appellants' contention, when all the facts in connection with the operations of respondents are considered we are of the opinion that the trial court was justified in coming to the conclusion which it did. The court relied upon the case of *Jones v. Shell Oil Co.,*

164 Wash. 543, 3 P. (2d) 141, in fixing the damages to be allowed in this case. While the *Jones* case was instituted by the operator of a gasoline station against an oil company to recover damages for the breach of a contract to furnish gasoline, the situation with which the trial court was confronted in regard to determining the basis for damages, if any, suffered by the plaintiff, was similar to that in the instant case. In the cited case, the gasoline was furnished by the company to Jones on consignment, and Jones was to receive a commission of four cents a gallon on all gasoline sold through his station. In the cited case, as in the present case, the records of the station were apparently introduced. In the instant case, all the records of respondents' operations in regard to all the stations to which it furnished gasoline were introduced and were before the trial court, and, as we have stated, the court concluded that the commission received from the sale of gasoline to the Zerrs was profit. Relative to this question, we quote from the *Jones* case, *supra:*

"The amount of the verdict for lost profits was well within the proof, *especially so since no additional force or facilities were needed to handle the larger prospective trade than was maintained to handle the goods actually supplied by the appellant,* and, at the same time, there was no proof of any legal justification on the part of the appellant for the breach of its contract." (Italics ours.)

Appellants further contend the contract here in question was the contract of Casper Zerr, and not that of Vincent Zerr and wife. It may be admitted that the contract was signed by Casper Zerr only.

In volume 1 of the Restatement of Agency, § 153, we find the following statement:

"For the purpose of satisfying the provisions of a statute requiring a note or memorandum to be signed by the party to be charged or by his agent, a memo-

randum signed by a properly authorized agent with or without indication of the existence or identity of the principal is sufficient to charge the principal."

Section 27 of the Restatement provides:

"Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act may be created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

Section 50 of the Restatement provides:

"Unless otherwise agreed, authority to make a contract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it."

Section 55 of the same text states:

"Unless otherwise agreed, authority to contract for a purchase or sale includes authority to enter into negotiations for and to complete the purchase or sale, including therein usual or other appropriate terms, and, if a writing is required or is usual, to execute such writing."

Section 73 states what authority is inferred:

"Unless otherwise agreed, authority to manage a business includes authority: (a) to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it; . . ."

For a general discussion of authority of an agent, see 2 Am. Jur. 68, § 85 *et seq.*

The case of *Nordwall v. Cohen,* 134 Wash. 262, 235 Pac. 824, is the only case called to our attention in which the facts are such as to justify us in holding the rule therein announced is applicable to the instant case.

In the cited case, one Harry Smith, acting as the general agent of defendants Cohen in the state of Washington, entered into contracts with the growers of apples for advances to be made to them by defendants, and also entered into contracts for sales on commission, making practically all of the outright purchase of apples for defendants. The original plaintiffs instituted this action to recover from the Cohens a balance due for apples alleged to have been sold them. The defendants Cohen answered, denying that they had purchased any apples from plaintiffs, either in their own name or in the name of the Cascade Packing Company, and were not indebted to plaintiffs in any sum. There are other features of the case with which we are not concerned. The part of the opinion which we believe particularly applicable here states:

"From the foregoing recitals, it would seem to follow that the judgment of the court, as between the appellants Cohen and the plaintiffs in the action, is without error. Harry D. Smith was the general agent of the appellants for the purchase of apples on their behalf, and the apples of the plaintiffs were purchased by him as such general agent. It matters not, therefore, whether he contracted to purchase them in his own name, in the name of the Cascade Packing Company, or in the name of the appellants as they were known at their Pittsburg place of business. In either event they were purchased on behalf of the appellants. The obligations incurred by the purchases were the obligations of the appellants."

We are of the opinion there was sufficient evidence in the instant case, relative to the operation of the station by Casper Zerr, to justify the trial court in holding that Casper Zerr was the general agent of his father, Vincent Zerr, in such operation. The contract here involved was the usual contract made in connection with such operations. It should also be kept in mind that both Quist, Jr., and Mr. Martin testified

that Vincent Zerr told them Casper was going to operate the station, and to transact their business with him. We are satisfied that Casper Zerr had full authority to sign the contract as the agent of Vincent Zerr and wife, and that it is in fact the contract of appellants.

■ We are also inclined to the view expressed by the trial court that appellants ratified the contract by accepting deliveries thereunder for a period of at least six months after the contract had come to the attention of Vincent Zerr.

The last contention of appellants is that the trial court abused its discretion in failing to grant appellants' motion to dismiss Vincent Zerr and wife, made at the very opening of the case. This contention is largely based upon the fact that there was no allegation of agency in the complaint, the contract on its face purporting to be that of Casper Zerr.

It is true that appellants made such a motion, but it also appears that, at that time, counsel for respondents stated that they were proceeding on the theory that Casper Zerr was the duly authorized agent of appellants. It does not appear that counsel for appellants claimed any surprise or asked for a continuance, but proceeded with the trial; nor did counsel for appellants at any time ask that the complaint be made definite and certain. It further appears that, after the case was concluded and the court had announced its decision, the court reopened the case for the purpose of permitting appellants to put in any additional evidence they might desire. Prior to the reopening, the court had ordered the complaint amended to conform to the proof, as hereinbefore stated, so there can be no doubt that, when the case was reopened, appellants knew what they had to meet. After the case was reopened, appellants did put in additional testimony, and after a consideration of this additional testimony,

as well as the other evidence in the case, the court made and entered its findings of fact, conclusions of law, and judgment.

We believe that, under the circumstances of this case, the trial court was justified in ordering the complaint amended to conform to the proof. We stated in *Snohomish River Boom Co. v. Great Northern R. Co.*, 57 Wash. 693, 107 Pac. 848:

"It is claimed that the complaint does not state a cause of action. No demurrer was filed to the complaint; but, after the issues were made and the cause came on for trial, an oral general demurrer was interposed and an objection to the introduction of any evidence was made and overruled. Under the rule stated in *Peterson v. Barry*, 50 Wash. 361, 97 Pac. 239, and cases there referred to, these objections cannot avail where, after trial, the facts are sufficient to justify a recovery."

In the instant case, no demurrer to the complaint was interposed, but objection was made to the introduction of any testimony purporting to show liability on the part of the appellants.

The right of the trial court or this court to consider the pleadings amended to conform to the proof would not seem to be dependent upon whether or not objection was made to the introduction of such testimony, for in the case of *Keisel v. Bredick*, 192 Wash. 665, 74 P. (2d) 473, we stated:

"The testimony on this matter, upon which the instructions were based, was in the case without objection, and, even if it had been received over objection, the complaint would be considered amended to conform to the proof 'so far as may be just.' *Laucks v. Hartford Fire Ins. Co.*, 152 Wash. 241, 277 Pac. 834."

We also call attention to Rem. Rev. Stat. (Sup.), § 308-6 [P. C. § 8676-9], rule VI, subd. 9, 193 Wash. 44-a, which provides:

"At any time after trial, whether before or after judgment, the trial or appellate court may allow or make any amendment necessary to make a pleading conform to the proof, so far as may be just."

While, as hereinbefore stated, we are satisfied that the trial court had authority to order the complaint amended to conform to the proof, however, in this case the trial court reopened the case and allowed appellants to introduce any additional testimony they might desire. In view of this fact, we are unable to see how appellants can claim they were prejudiced by the action of the trial court.

Appellants, to sustain this contention, cite the case of *Lawson v. Sprague,* 51 Wash. 286, 98 Pac. 737, which was determined below upon a demurrer to the complaint. The demurrer was sustained, and, plaintiff not desiring to further plead, the action was dismissed. We think the above statement sufficient to show the case is not applicable herein. In the cited case, the trial court was required to construe the complaint as it appeared upon its face, unaided by any proof, and we are of the opinion that what was said there must be considered with that situation in mind.

We are satisfied from an examination of this entire record that appellants had a fair trial, that the trial court committed no prejudicial error, and that the judgment must be, and it is, affirmed.

ROBINSON, C. J., BEALS, BLAKE, and SIMPSON, JJ., concur.