[No. 29409. Department One. November 10, 1944.]

JOHN PAPPAS, *Appellant,* v. JAMES ZERWOODIS *et al.,*
*Respondents.*[1]

[1]Reported in 153 P. (2d) 170.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Christ D. Lillions,* for appellant.

*Wm. V. Cowan,* for respondents.

STEINERT, J.—The lessee of a building brought suit for specific performance of the lessors' covenant to repair and also for damages alleged to have been sustained by the lessee because of the lessors' breach of that covenant. Sometime after the commencement of the action, but prior to the time of the trial, the lessors repaired and also repainted the building, and at the hearing before the superior court the lessee conceded that his claim for specific performance had been fully satisfied. The trial therefore proceeded upon the issue of damages alleged to have been sustained by the lessee because of the lessors' earlier breach of the covenant, in that they had not made the repairs sooner than they did. At the conclusion of the trial, and after taking the cause under advisement, the trial court rendered a memorandum opinion and subsequently entered judgment dismissing the action, but without costs to either party. The plaintiff lessee appealed.

Respondent lessors are the owners of certain premises situated at the junction of three highways near the city of Renton. On August 16, 1939, they leased the premises, including the building thereon and the equipment therein, to the appellant for use as a restaurant, tavern, and dance hall, for a term of three years beginning October 1, 1939, at a rental of ninety dollars a month. The lease provided that its term of existence could be extended for an additional three-year period at the option of the lessee, on the basis of a monthly rental to be agreed upon by the parties at the end of the original term, and in case of their inability to agree upon the amount of such rental it was to be determined by a committee of three arbitrators.

The lease contained a covenant reading as follows:

"It is further hereby agreed that the lessors shall keep the exterior of the building, namely roof and walls, in proper condition with necessary painting and will also be responsi-

ble for any repairs needed in the sewer connections of the said building."

The front wall and one side wall of the building were of stucco composition and the rest of the building presumably was of the ordinary frame construction. The roof was flat, covered with an asphalt top, and was surrounded on three sides by fire walls.

At the end of the original three-year term, appellant elected to take an extension of three additional years as provided in the lease, but the parties were unable to agree upon the amount of the monthly rental for the extension period. Respondents were demanding that the rent be increased to one hundred fifty dollars a month; appellant was insisting that it be reduced to fifty dollars. Appellant was operating the place at that time simply as a tavern and dance hall, where beer, wine, and soft drinks were sold and where dances were held two nights a week, but no meals were then being served. It appears also that for some time past appellant had been complaining that the roof of the building leaked and that the exterior needed painting.

The parties being unable to come to any satisfactory agreement, three arbitrators were selected, in the manner provided in the lease, to determine the amount of the monthly rental to be charged during the period of the extension. After an inspection of the building, conferences with the respective parties, and a consultation among themselves, the arbitrators made a written report fixing the amount of such rental at one hundred dollars a month. In their report the arbitrators also expressed the view that the lessors had not fully complied with their obligations to the lessee and recommended "that the landlord fix up the building better than he has in the past; that is fix the roof; and keep the place in repairs." It appears, however, that shortly before the arbitrators made their report, respondents had put a new asphalt covering on the roof at an expense of one hundred dollars, although they had not done anything in the way of painting during the entire term of the lease.

Pursuant to the report of the arbitrators, the lease was extended and appellant periodically paid the increased rental

of one hundred dollars a month. He continued to make complaint, however, regarding the condition of the roof and exterior walls of the building, and respondents endeavored from time to time to make the roof watertight, but did not immediately paint the exterior. Considerable ill-feeling thus seems to have been engendered between the parties, culminating in the institution of this action by the appellant in July, 1943, which was about nine months after the commencement of the extended period of the lease.

In his complaint, as amplified by a bill of particulars, appellant alleged that respondents had breached their covenant to repair by allowing the roof of the building to remain in a leaky condition, with the result that in the rainy season water frequently dripped in various spots upon the dance floor and upon the tables in the adjoining booths, to the great discomfort and annoyance of his patrons, and that respondents had further breached their covenant by failing to paint the exterior of the building, in consequence of which the place had a dilapidated appearance, causing many of his customers to discontinue their patronage. The complaint further alleged that the damages resulting from the respondents' failure to perform the above-mentioned covenant of the lease amounted to "approximately $10.00 per day," and recovery in that amount was asked. The prayer of the complaint also asked for specific performance of the covenant of the lease. In their answer to the complaint respondents denied *in toto* appellant's allegations respecting breach of covenant and consequent damage.

Inasmuch as the action in its inception was a suit in equity for specific performance of the covenant to repair, the trial court was not required to, and did not, make findings of fact. The court did, however, render a memorandum opinion, in which it carefully reviewed and analyzed the evidence and gave a summary of the facts as, in the opinion of the court, they appeared to be established by the evidence. While there is some conflict in the testimony, the material facts are not greatly in dispute. Our view of the factual situation coincides with that expressed by the trial court and may be briefly stated as follows:

About the time of the expiration of the original term of the lease in 1942, a dispute arose between the parties concerning the amount of monthly rent to be charged during the extended term. On account of the outbreak of the present world war and the construction of various government works and other projects in and near Renton, there had been a great influx of people in the immediate vicinity of the premises here involved. For that reason respondents were demanding that the rent for the extended term be increased from ninety dollars a month to one hundred fifty dollars. Appellant, on the other hand, was insisting that the premises were worth not more than fifty dollars a month. Among other reasons given by the appellant for demanding a reduction in rent were the alleged physical condition and appearance of the building. Appellant complained of the shabby appearance of the place due to the fact that the building had not been painted for five or six years. He also complained that the roof leaked in several places, allowing water to drop onto the dance floor and booths at various spots. Respondents endeavored to repair the roof and during the late summer or early fall of 1942 spent about a hundred dollars in that effort, but did not at that time do anything toward having the building painted.

The parties being unable to come to any satisfactory agreement, a committee of arbitrators was selected and the matter of rent was submitted to them for decision. After listening to the contentions of both parties and also investigating the premises, the committee on October 13, 1942, made its report fixing the rental for the extended term at one hundred dollars a month and recommending that respondents fix up the building better than they had done in the past, particularly with reference to the roof.

Throughout the fall and winter of 1942, and the early part of 1943, appellant continued to make complaint that the roof leaked, at times causing water to drip in spots upon the dance floor and upon the tables in the booths. It was testified that on one occasion it was necessary to set out pans to catch the dripping water, and also to move the patrons who were seated at one of the tables to another part of the

room. Frequently there were wet spots upon the ceiling and on one of the walls of the building. However, it does not appear that there was ever any actual interruption of appellant's business, nor was he ever compelled to close the place, even temporarily.

In response to appellant's complaints concerning the roof, respondents endeavored from time to time to remedy the situation. As stated above, just shortly before the arbitrators made their report in October, 1942, respondents had put a new asphalt coating on the roof at an expense of one hundred dollars. Apparently, however, this did not fully terminate the trouble, at least not to the appellant's entire satisfaction. At any rate he continued to make complaint throughout the latter part of 1942 and the early part of 1943. As these complaints were conveyed to respondent James Zerwoodis, he would visit the premises, most often with one or two assistants, and from the interior of the building would endeavor to locate the place where the roof was leaking. They would then go up onto the roof and make such repairs as seemed necessary in order to correct the situation. After completing the work they would return to the room below to ascertain whether they had succeeded in stopping the leak. This method of attempted repair was carried on many times, particularly during December, 1942, and January, 1943, and apparently with temporary success; but sooner or later another complaint would be made by the appellant. The difficulty seems to have been that of locating the exact place in the roof where the leak, or leaks, originated. The record is replete, however, with evidence of the respondents' continuous efforts to satisfy appellant's complaints with respect to the leaks. There is also considerable evidence in the record from which the trial court could have found, as it seems to have done, that appellant's complaints were greatly exaggerated.

At any rate, sometime in May, 1943, respondents engaged a contractor to inspect and renovate the entire roof and to paint the exterior of the building. The work could not be done, however, and was not done, until about the first of

August of that year. In the meantime, appellant had commenced this action.

In his memorandum opinion, the trial judge expressed the view that the respondents had carried out the suggestions of the arbitrators with reference to repairs, and had also repainted the building, as soon as weather and labor conditions permitted. A careful reading of the record convinces us that, while some leakage may have persisted during the time when appellant was making complaint thereof, respondents in turn made every reasonable effort to remedy the situation and did in fact accomplish as good results as could have been expected under the circumstances existing during the latter part of 1942 and the early part of 1943. So far as the painting of the exterior is concerned, we are also satisfied that this was undertaken as soon as it could, and should, have been done.

In expressing these conclusions, however, we are not to be understood as holding that respondents were not bound by their covenant or would not now be liable for any damages which may have actually resulted from their breach thereof, regardless of whether or not such breach came about through their willful neglect. On the contrary, we would be constrained to hold that, having covenanted to keep the roof and walls in proper condition, respondents would be liable for any ascertained damages shown to have been the proximate result of their failure to perform the covenant.

The trial court seems to have conceded, and we likewise assume from the very nature of the circumstances narrated above, that appellant was damaged to some extent by respondents' failure to keep the roof in proper condition against leakage. However, the important question in this case, both in the superior court and in this court, was and is not merely whether the appellant has sustained some damage by respondents' breach of their covenant, but, rather, whether the appellant has established the amount of his alleged damages by the required degree of proof.

Appellant's complaint was drawn upon the theory that the measure of his damages was his loss of profits. At the

trial, he endeavored at first to establish recovery strictly upon that theory alone, but later changed his position somewhat, to include as an additional measure of recovery the difference between the rental value of the property in the condition required by the covenant of the lease and the value thereof in the condition in which the property actually was at and prior to the time the action was brought. The trial court held that the evidence was insufficient to establish any definite amount of loss with any reasonable degree of accuracy, under either theory of the measure of damages. This appeal presents the question of whether the trial court was correct in its holding.

While there is a diversity of judicial opinion on the question of the measure of damages recoverable by the lessee from the lessor for the latter's breach of covenant to repair, the decisions are in general accord upon the postulate that the damages recoverable for the breach of such covenant must be such as are the direct, natural, and proximate result of the breach, and such as may reasonably be supposed to have been within the contemplation of the parties at the time they made the contract; and, conversely, that remote, contingent, or speculative damages are not recoverable. 32 Am. Jur. 592, Landlord and Tenant, § 717; 36 C. J. 165, Landlord and Tenant, § 801.

The most usual rule or measure for assessing a tenant's damages for breach of his landlord's covenant to repair or other covenant with respect to the use of property, where there is no claim for, or proof of, special damages, is the difference between the rental value of the property if kept in the condition of repair or utility required by the covenant and the rental value in the condition in which the property actually is. *Ingalls v. Beall,* 68 Wash. 247, 122 Pac. 1063; *Purcell v. Warburton,* 70 Wash. 129, 126 Pac. 89; *Matzger v. Arcade Building & Realty Co.,* 102 Wash. 423, 173 Pac. 47; *Schermerhorn v. Sayles,* 123 Wash. 139, 212 Pac. 156; *Yakima Lodge No. 53, K. P. v. Schneider,* 173 Wash. 639, 24 P. (2d) 103; 2 Underhill, Landlord and Tenant, § 526; 3 Sutherland, Damages (4th ed.), p. 3236; Taylor, Landlord and Tenant, §§ 117, 317; 32 Am. Jur. 593, Landlord

and Tenant, § 717; 36 C. J. 166, Landlord and Tenant, § 801; notes (1924), 28 A. L. R. 1495; (1938), 116 A. L. R. 1239.

■ On the other hand, where special damages, such as loss of profits, are specifically set forth and proved, the recovery by a tenant, for breach of his landlord's covenant to repair or other covenant with respect to the use of property, is not restricted to the difference in rental value, as expressed in the foregoing general rule, but may also include such loss of profits as has been directly and necessarily caused by the landlord's wrongful act or default. In such case, however, the loss must be shown with a reasonable degree of certainty and accuracy, and the proof establishing the loss must be clear and convincing, free from speculation or conjecture. These complementary statements express a rule to which this court is definitely committed. *Matzger v. Arcade Building & Realty Co., supra; Schermerhorn v. Sayles, supra;* accord: *Kohne v. White,* 12 Wash. 199, 40 Pac. 794; *Cordes v. Guy Inv. Co.,* 146 Wash. 143, 262 Pac. 131. Other cases illustrating the same principle are: *DeHoney v. Gjarde,* 134 Wash. 647, 236 Pac. 290; *Schultz v. Wells Butchers' Supply Co.,* 151 Wash. 382, 275 Pac. 737; *Blakiston v. Osgood Panel & Veneer Co.,* 173 Wash. 435, 23 P. (2d) 397; *Quist v. Zerr,* 12 Wn. (2d) 21, 120 P. (2d) 539; *Automatic Canteen Co. of Washington v. Automatic Canteen Co. of America,* 182 Wash. 133, 45 P. (2d) 41. See, also, 15 Am. Jur. 558, Damages, § 150.

The position taken by this court on this general subject is well illustrated by the case of *Matzger v. Arcade Building & Realty Co., supra,* which was an action for damages against a landlord for interference with the access of light and ventilation to a storeroom occupied by a tenant. On the question of loss of profits as a measure of damages, the court said:

"It may be granted that, in certain cases, a tenant may show a loss of profits in the conduct of an established business where the landlord has unreasonably interfered with the full enjoyment and use of the demised premises. But cases so holding rest in an exception to a general rule, which has twice been declared by this court. *Kohne v. White,* 12 Wash. 199, 40 Pac. 794; *Purcell v. Warburton,* 70 Wash. 129,

126 Pac. 89. Interference with light is a breach of the covenant of quiet enjoyment. Taylor, Landlord and Tenant, 309(a).

"The measure of damages for an interruption of quiet enjoyment by the landlord is the difference between the value of the use of the property as furnished by the landlord and the rent reserved. In other words, it is the diminished value of the use of the property. Tiffany, Landlord and Tenant, § 79g; Underhill, Landlord and Tenant, § 432; Taylor, Landlord and Tenant, §§ 177 and 317; 16 R. C. L. 770.

"Loss of profits are usually regarded as too contingent, remote or speculative to be considered. 16 R. C. L. 1056. The general rule should not be departed from unless it is impossible to measure the losses by it, or the character of the business is such and the proof of the profits so clear that the court can say, as a matter of law, that loss of profits was within the contemplation of the parties at the time the contract was made. If this be so, it will declare lost profits to be the measure of damages. . . .

"But if it be held that the loss of usable value is not a proper measure of damages, the exception to the rule allowing a loss of profits should not be allowed in this case, for, in sound reason and under all authority, a loss of profits is not allowed unless they can be measured with a fair degree of accuracy. The testimony must be clear and free from taint of speculation or conjecture. The rule rests in a principle applied in all cases for damages arising out of a sale of property or the use of property.

"To sustain a verdict for prospective profits, the jury must have some reasonable basis for estimating the worth of the business. From the nature of things, prospective profits cannot be proved to the dollar. Yet the law does demand that there shall be tangible evidence sufficiently clear and convincing to reasonably sustain a verdict. There must be some standard of comparison."

Again, in *DeHoney v. Gjarde, supra,* this court said:

"True, this court is committed to the rule that loss of profits may be recovered, but we have said that the loss must be shown with a reasonable degree of accuracy, and that the testimony establishing the loss must be clear and free from taint of speculation or conjecture. [Citing cases.]"

■ The trial court applied these rules to the evidence in the instant case and came to the very emphatic conclusion

that appellant had not shown any loss of profits with any reasonable degree of accuracy, but that, on the contrary, his testimony on that subject was at best speculative and conjectural. Our examination of the record leads us just as positively to the same conclusion.

There was no showing of the amount of profits that appellant had customarily been making, nor was there any convincing evidence concerning the amount of loss of profits due to the condition of the premises. Appellant testified that the bookkeeper's receipts showed a loss of ten or eleven dollars a day, but no books were produced in court, nor was any explanation given as to how the loss was computed. Appellant testified that some of his patrons quit coming to his place because of the leaky roof, and others because of the dilapidated appearance of the exterior of the place, but there was nothing definite shown as to how many people quit coming, or when they quit, or how much loss of profits was due to that circumstance. It is further to be noted that appellant claimed that his damages amounted to ten dollars a day, as though the roof was constantly leaking every day and every night. Manifestly, that is not true. It is also to be remembered that dances were held only two nights a week, and it was only on those nights that his patrons could have been discommoded by dripping water while dancing. With respect to loss of profits caused by respondents' delay in painting the building, the proof is even more meager in extent and less certain as to the amount of loss sustained.

We recognize that it would be impossible for appellant to establish his loss of profits with mathematical exactness or absolute certainty, and that consequently the law will not hold him to so strict a requirement, but in any event the burden was upon him to prove his loss with at least such certainty and accuracy as would enable the court to find from the evidence that he had been damaged in a stated amount. A reading of the record convinces us that neither the trial court nor anyone else could say that appellant had sustained a loss of profits in any specific amount whatever.

The other measure of damages on which appellant relied for recovery was the alleged diminished rental value of

the property. He testified that, because of respondents' failure to repair and repaint the building, the rental value of the premises was only fifty dollars a month instead of one hundred dollars, the amount he was required to pay, and did pay, during the period of the extension. Appellant's qualification to testify on that subject is not shown by the record. Assuming for the sake of argument only, that his status as a tenant qualified him to testify thereon, we are not greatly impressed by his testimony in that respect. The arbitrators themselves had recently fixed the rental value at one hundred dollars a month, although that amount was in the nature of a compromise between the claims of the two parties. Moreover, Mr. Zerwoodis, the owner of the building, testified at the trial that the rental value of the property was one hundred fifty dollars a month, and that he could get that amount for it. His testimony upon that question seems to us to have the greater weight. We conclude, as did the trial court, that the appellant likewise failed to establish, by the required degree of proof, his damages upon the basis of the difference in rental value of the property.

 Finally, appellant contends that, in any event, the trial court erred in refusing to award him nominal damages. That contention is without merit upon the appeal for it is the settled rule in this state that where the sole object of the action is the recovery of damages, the failure to give nominal damages is not ground for reversal of a judgment. *Johnson v. Cook,* 24 Wash. 474, 64 Pac. 729; *Commercial Inv. Co. v. National Bank of Commerce,* 36 Wash. 287, 78 Pac. 910; *Storseth v. Folsom,* 50 Wash. 456, 97 Pac. 492; *Casassa v. Seattle,* 75 Wash. 367, 134 Pac. 1080; *Hewson v. Peterman Mfg. Co.,* 76 Wash. 600, 136 Pac. 1158, Ann. Cas. 1915D, 346, 51 L. R. A. (N.S.) 398; *State v. Buckley,* 98 Wash. 379, 167 Pac. 1087; *Clark v. Kennedy,* 162 Wash. 95, 297 Pac. 1087; *Phillips v. Pantages Theatre Co.,* 163 Wash. 303, 300 Pac. 1048; *Kenworthy v. Kleinberg,* 182 Wash. 425, 47 F. (2d) 825.

The judgment is affirmed.

SIMPSON, C. J., MILLARD, JEFFERS, and GRADY, JJ., concur.