[No. 14045-8-III.   Division Three.   September 5, 1996.]
FRANK TIEGS, ET AL., *Respondents*, v. BOISE CASCADE
CORPORATION, ET AL., *Appellants*.

*Eugene I. Annis* and *Lukins & Annis, P.S.; Richard W. Elliott* and *Davis Wright Tremaine*; and *Guy G. Hurlbutt* of *Boise Cascade Corp.* (of counsel), for appellants.

*R. Crane Bergdahl*; and *John G. Schultz, George B. Fearing*, and *Leavy, Schultz, Davis & Fearing, P.S.*, for respondents.

SCHULTHEIS, A.C.J. — Boise Cascade Corporation and Donald Watts, d/b/a Don Watts Farms, appeal a jury verdict in excess of $2.5 million entered in favor of the plaintiff potato farmers in their action for nuisance and breach of lease. Boise and Mr. Watts raise multiple issues, including whether (1) a violation of the water pollution control act, RCW 90.48, is a nuisance per se; (2) an unacknowledged lease is enforceable on an estoppel theory; and (3) an award of lost profits due to breach of an option to lease for another year is speculative. We affirm.

Mr. Watts owned 650 acres of farm property in Walla Walla County. The acreage is situated across Highway 12 from a pulp and paper mill owned and operated by Boise. In 1988, Mr. Watts planted one irrigation circle in potatoes and leased another circle to James Smith, who did the same. Both men drew water from a single well.

On November 28, 1989, Mr. Watts leased the remaining acreage to partners Frank Tiegs, d/b/a Greenridge Farms, and Fred and Allen Olberding, d/b/a LC Farms. The lease

was for the 1990 crop year. It was "contingent on [Mr. Watts] finding adequate water for [the] property," and provided the irrigation for the acreage would apply 7.5 gallons per minute. The lease also gave the lessees an option for 1992.[1] Mr. Watts subsequently installed four more wells for circles three through nine. He also leased circles one and two to Mr. Smith for crop year 1990. That spring, the lessees planted Russet Burbank potatoes in the circles, save for circle two, which Mr. Smith planted in Norkotahs, another potato variety. Mr. Tiegs and the Olberdings testified the circles they leased had not been planted in potatoes before, a fact that promised higher than average yields.

In June 1990, Mr. Tiegs and the Olberdings noticed abnormalities in the potato leaves, including leaf curl or fiddlenecking. They called in several consultants to look at the fields. One consultant, Dr. William Cobb, took water samples for analyses. The symptoms continued all season, and the harvest yielded potatoes of poorer quality, and less quantity, than the lessees had expected. Dr. Cobb concluded the symptoms exhibited by the potato plants were caused by the well water used for irrigation. The well drew on groundwater that Dr. Cobb believed was contaminated by chemicals from the paper mill's wastewater "lagoon," which is part of its water treatment system. Boise maintained extreme heat and wind were responsible for the symptoms and the decreased yield.

In January 1991, Mr. Tiegs and the Olberdings sued Boise and Mr. Watts, alleging Boise had contaminated the wells and Mr. Watts had breached his agreement to supply adequate water for the circles.[2] Mr. Smith, whose crop had exhibited the same symptoms, intervened in the action in March 1992. In August 1991, Mr. Tiegs and the Ol-

---

[1]Potato crops are planted only every other year.

[2]The plaintiffs' amended complaint also named IBP, Inc. (Iowa Beef Processors) and members of the Lundgren family as defendants. IBP operates a beef processing plant and the Lundgrens own a cattle feed lot, both of which are located north of the acreage. They were dismissed at the close of the plaintiffs' case.

berdings attempted to exercise their option to lease the same property for 1992. In the meantime, Boise had purchased all 650 acres from Mr. Watts. Under the terms of the purchase agreement, Boise agreed to assume any liability Mr. Watts might have pursuant to the leases. It took the position the plaintiffs' lawsuit was inconsistent with exercise of the option.

Trial took place in February and March 1994, over a period of nine weeks. The jury entered special verdicts in favor of the plaintiffs against Boise on a nuisance theory and against Mr. Watts for breach of the lease. For crop year 1990, the jury awarded Mr. Tiegs and the Olberdings $878,069 and Mr. Smith $563,467, dividing liability for these amounts between Boise and Mr. Watts. It also awarded Mr. Tiegs and the Olberdings $1,147,258 in lost profits for breach of the 1992 option.

Boise and Mr. Watts have appealed the judgment entered on the jury's verdicts. Additional facts are set forth below in the analyses of the issues.

First, did the court properly instruct the jury on the law of nuisance? Boise contends it was error for the court to (a) instruct the jury a violation of RCW 90.48, Washington's water pollution control act, constitutes a nuisance and (b) refuse Boise's proposed instruction that the jury must find a lawful business's use of its land is unreasonable before it can conclude such use is a nuisance.

In Washington, the law of nuisance is codified in RCW 7.48. *Hostetler v. Ward*, 41 Wn. App. 343, 355-57 & n.10, 704 P.2d 1193 (1985), *review denied*, 106 Wn.2d 1004 (1986). Actionable nuisances are defined broadly as "whatever is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to . . . interfere with the comfortable enjoyment of . . . life and property . . . ." RCW 7.48.010; RCW 7.48.120. A public nuisance "affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." RCW 7.48.130; *Kitsap County v. Kev, Inc.*, 106 Wn.2d 135, 139, 720 P.2d 818 (1986). A

private nuisance is "[e]very nuisance not included in the definition of RCW 7.48.130 . . . ." RCW 7.48.150. Remedies include abatement and/or damages. RCW 7.48.180, .200. In the case of a public nuisance, a private person may maintain a civil action only if the nuisance is "specially injurious to [him]." RCW 7.48.210.

Here, the trial court's instruction 12 used the language of RCW 7.48.120: *"Nuisance consists in unlawfully doing an act,* or omitting to perform a duty, *which* act or omission . . . *in any way renders other persons insecure . . . in the use of property."* (Emphasis added.) Instruction 16 recited the provisions of RCW 90.48.080 of the water pollution control act:

It shall be unlawful for any person to throw, drain, run, or otherwise discharge into any of the waters of this state, or to cause, permit or suffer to be thrown, run, drained, allowed to seep or otherwise discharged into such waters any organic or inorganic matter that shall cause or tend to cause pollution of such waters . . . .

The instruction then stated: "A violation of this statute constitutes a nuisance."

Instruction 14 defined "pollution," as found at RCW 90.48.020, to mean "contamination . . . of any waters of the state, including . . . discharge of any liquid . . . into any waters of the state as will or is likely to create a nuisance . . . ." Finally, jury instruction 13 set forth the policy of the state, as found at RCW 90.48.010:

It is declared to be the public policy of the state of Washington to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, . . . and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington. Consistent with this policy, the state of Washington will exercise its powers, as fully and as effectively as possible, to retain and secure high quality for all waters of the state.

Boise excepted to these instructions. It complains the

instructions were improper because RCW 90.48 does not create a private cause of action for enforcement of its provisions. Hence, it reasons the act cannot be used as a basis for a jury finding Boise's alleged violation of its provisions amounted to a nuisance. Boise contends the court should have given its proposed instructions 40 and 41, which stated the plaintiffs had the burden of proving Boise's use of its property *unreasonably* interfered with their use.[3]

■■ In *Miotke v. City of Spokane*, 101 Wn.2d 307, 309, 678 P.2d 803 (1984), the court held the city's discharge of raw sewage into the Spokane River, violating a water disposal permit, was a wrongful act that gave rise to an action for nuisance by private landowners seeking damages. The court reasoned: "In short, it is clear from the federal and state statutory schemes [including RCW 90.48] . . . that the discharge of pollutants into state waters is prohibited unless authorized by a permit." *Miotke*, 101 Wn.2d at 329. In addition, although RCW 90.48 (the act at issue here) does not provide a private right of action, a discharge violating the statute "constitutes a nuisance . . . and entitled plaintiffs to recover damages." *Miotke*, 101 Wn.2d at 330.

*Miotke*'s recognition of an action for nuisance based upon a defendant's violation of a statute is supported by

---

[3]Proposed instruction 40 reads:

**"Nuisance—Reasonableness**

"The general principle of the law of nuisance is that one landowner will not be permitted to use his land so unreasonably as to interfere unreasonably with another's use and enjoyment of his land. In determining reasonableness, the fundamental inquiry is whether the use of certain land can be considered as reasonable in relation to all the facts and surrounding circumstances. Application of the doctrine of nuisance requires a balancing of rights, interests and convenience."

Proposed instruction 41 reads:

**"Nuisance—Interference**

"In order to constitute a nuisance, the interference with the use and enjoyment of another's property must be substantial and unreasonable."

418

8 THOMPSON ON REAL PROPERTY, THOMAS EDITION § 67.03(a)
(1), at 94-95 (David A. Thomas ed., 1994):

> When a statute or a local ordinance [declares] *conduct . . .
> illegal, without . . . label[ing it] as a nuisance, it will be
> considered a nuisance as a matter of law only if that conduct
> interferes with others' use and enjoyment of their lands. . . .*
>
> . . . .
>
> Although a rather wide range of landowner activity could
> conceivably be declared illegal and thus considered nuisances
> as a matter of law because forbidden by law, in fact only a
> few distinct categories of such conduct have emerged from
> the cases. . . .
>
> . . . *Other conduct that may be illegal and cause a private
> nuisance would be activities that create pollution.*

(Footnotes omitted, emphasis added.)

The treatise cites *Branch v. Western Petroleum, Inc.*, 657
P.2d 267 (Utah 1982). There, a landowner sued a neighbor-
ing landowner whose oil wells, in violation of statute, pol-
luted groundwater that supplied plaintiff's well. The ap-
pellate court sustained the judgment in favor of the
plaintiff, holding the facts established a nuisance per se. It
reasoned:

> When the conditions giving rise to a nuisance are also a viola-
> tion of statutory prohibition, those conditions constitute a
> nuisance per se, and *the issue of the reasonableness of the
> defendant's conduct* and the weighing of the relative interests
> of the plaintiff and defendant *is precluded because the
> Legislature has, in effect, already struck the balance in favor
> of the innocent party. Defendant's violation of § 73-14-5 . . .
> and § 76-10-801 removed the issue of the reasonableness of its
> conduct compared with the nature of the injury inflicted from
> consideration in this case.* The declaration of the Legislature
> is conclusive, and its determination will not be second
> guessed. The result for practical purposes is the same as strict
> liability.

*Branch*, 657 P.2d at 276 (citations omitted, emphasis add-

ed). The court also observed that "[i]t is of no consequence that a business which causes a nuisance is a lawful business." *Branch*, 657 P.2d at 274.

Boise attempts to distinguish *Miotke* on the basis the city's dumping raw sewage into the Spokane River was clearly in violation of its wastewater permit. Boise contends its operation was authorized by the Department of Ecology (DOE) when it approved and renewed Boise's national pollutant discharge elimination system (NPDES) permit. Boise points out instruction 16 *supra* omitted what it regards as a crucial phrase present in RCW 90.48.080; i.e., that the deposit of material that causes pollution in state waters, "*according to the determination of the [DOE]*," is unlawful. (Emphasis added.)

We agree with Boise that specific conduct which is approved and authorized by the agency charged with enforcing the act in question does not constitute a nuisance per se. *Miotke* and *Branch* both involved illegal activity. Nevertheless, Boise did not present any evidence that DOE approved the amount of seepage that occurred here. At trial, Boise relied upon the fact DOE notified it in 1979 "that [it required] both primary and secondary ponds be constructed or modified to achieve a leakage rate not exceeding 0.25 inches per day." But Michael Pelko, who is in charge of DOE's Industrial Section, testified he did not know whether DOE had ever "made any calculation or done any study or testing to find out if the lagoon [meets] that criteria." Further, evidence at trial showed Boise's own geohydrologists expressed concern as early as 1978 that the lagoon, which was not fully lined, might leak pollutants into the aquifer. Dennis Ross of Boise admitted his company never tested the groundwater. In these circumstances, Boise cannot argue its conduct was authorized.[4]

Finally, Boise contends it was error for the court to

---

[4]Boise also attempts to distinguish *Miotke* on the ground the court there found the alleged nuisance, the dumping of raw sewage in the river, was a public nuisance. *Miotke*, 101 Wn.2d at 331. However, RCW 7.48.020 provides a nuisance action "may be brought by any person whose property is . . . injuriously affected . . . ."

advise the jury of the legislative policy statement contained in RCW 90.48.010. *See* instruction 13 *supra.* It cites *Food Servs. of Am. v. Royal Heights, Inc.*, 123 Wn.2d ·779, 788, 871 P.2d 590 (1994). That case observed that while a. statutory declaration of policy has no operative effect, it is useful in helping the court determine the interpretation the Legislature intended. Neither the foregoing case nor any other cited by Boise forbids the use of such statements in jury instructions. *See Dillon v. State*, 277 Md. 571, 357 A.2d 360 (1976), in which the court approved that use, reasoning that if policy statements are helpful to a court in interpreting a statute they are likewise helpful to a jury. *Dillon*'s rationale is persuasive.

The instructions were proper. If the jury determined Boise was leaching pollutants into the groundwater, then that act was unlawful under RCW 90.48 and constituted a nuisance. If Boise wanted to rely upon its NPDES permit as proof its conduct relative to its wastewater treatment operation was legal, then it also had the burden of showing it complied with the permit. It failed to do so.

Second, did the court err when it denied Boise's motion for a directed verdict on Mr. Tiegs's and the Olberdings' action for damages for loss of their 1992 lease option? Boise contends: (a) the lease was void under the statute of frauds because Mr. Watts's signature was not acknowledged; (b) the doctrine of estoppel is not available to enforce the unacknowledged lease; (c) the leases were terminated by the parties' mutual mistake as to the availability of suitable water; and (d) Mr. Tiegs and the Olberdings were estopped from asserting damages for loss of their lease option, given their position that the water was causing crop damage.

(a) Statute of Frauds and (b) Estoppel

Boise argues the trial court should have decided as a matter of law that Mr. Tiegs and the Olberdings had no cause of action based upon the option to renew the lease for the 1992 growing season. It relies upon the fact Mr. Watts's signature on the lease was not acknowledged; i.e.,

it was not notarized nor did any other witness attest to its authenticity. Boise cites RCW 59.04.010, 64.04.010 and 64.04.020, which require leases for periods in excess of one year be in writing, signed by the party to be charged, and acknowledged. *See Labor Hall Ass'n v. Danielsen*, 24 Wn.2d 75, 163 P.2d 167, 161 A.L.R. 1079 (1945); *Stevenson v. Parker*, 25 Wn. App. 639, 608 P.2d 1263 (1980).

At trial, Mr. Tiegs and the Olberdings successfully argued that Boise, and Mr. Watts before it, were estopped to assert the lease was void for lack of acknowledgment. The court ruled the lack of acknowledgment did not automatically void the lease and that evidence of estoppel presented a jury question. It therefore instructed the jury:

## INSTRUCTION NO. 17

. . . .

A breach of the lease by either of the contracting parties gives the non-defaulting party a claim for damages proximately caused by the breach against the other party and any successor in interest of such other party.

In order to be valid for a period beyond one year, the signature of the lessor must be acknowledged before a notary public. Since the lessors' signatures in the Watts and Tiegs/Olberding lease were not acknowledged, the 1992 option is invalid unless the lessors or their successor, Boise Cascade, is prevented by some act or promise from asserting the invalidity of the 1992 option. This is called "estoppel."

The doctrine of estoppel prevents a party from taking inconsistent actions to the detriment of another party. The elements of estoppel are 1) an admission, statement or act, inconsistent with the claim afterwards asserted; 2) action by the other party on the faith of such admission, statement or act; and 3) injury to such other party arising from permitting the first party to contradict or repudiate such admission, statement or act.

If you find that Boise Cascade is estopped to assert the invalidity of the 1992 option, then you may consider damages for 1992.

Boise excepted to the foregoing instruction.

▮ Washington courts have enforced leases that do not comply with the statutory requisites when the facts make it inequitable for the challenging parties to assert the invalidity of their agreements. 1 Washington State Bar Ass'n, *Real Property Deskbook* § 9.21, at 9-23 (2d ed. 1986). These decisions are based upon theories of estoppel or part performance, although the distinction appears more a matter of semantics, since their fact patterns are similar. 1 *Real Property Deskbook, supra* § 9.22, at 9-24 (citing *Garbrick v. Franz*, 13 Wn.2d 427, 125 P.2d 295 (1942); *Haggen v. Burns*, 48 Wn.2d 611, 295 P.2d 725 (1956)). A tenant's act in doing some onerous thing he or she would not have done but for the lease, such as paying sums beyond the rent to the landlord, may give rise to estoppel or part performance. 1 *Real Property Deskbook, supra* § 9.22, at 9-25 (citing *Franklin v. Fischer*, 34 Wn.2d 342, 208 P.2d 902 (1949); *Mobley v. Harkins*, 14 Wn.2d 276, 128 P.2d 289, 143 A.L.R. 88 (1942)).

In *Franklin*, the written lease for a service station provided that rent, calculated as a percent of gross receipts and other items, would be no less than a certain, set minimum per month after the first 12 months. The lessee assigned the lease to another party, who thereafter paid only the percentages and not the minimum payment. In the lessor's action to recover possession, the assignee contended the lessor orally agreed he would not enforce the minimum amount if the assignee paid him $3,000 and took over the lease. The court held: "The . . . payment and circumstances constituted a complete performance of the [assignee's] part of the modification agreement and removed the agreement from the statute of frauds." *Franklin,* 34 Wn.2d at 346-47.

In *Mobley*, the plaintiff sought to enforce an oral agreement to assign a lease. The court held that the agreement at issue came within the statute of frauds and therefore was required to be in writing. *Mobley*, 14 Wn.2d at 283. However, that fact did not "compel a conclusion that the oral agree-

ment to assign the lease is unenforcible." *Mobley*, 14 Wn.2d at 283. Rather, "numerous decisions" "have enforced oral leases for the full term provided for therein because of the existence of facts, in addition to possession and payment of rent, which invoke the principles of equitable estoppel." *Mobley*, 14 Wn.2d at 284. In enforcing the oral agreement, the court cited the fact the tenant had paid approximately $500 for fixtures, equipment and assignment of the lease, which secured it the right to continue the business on the premises for a fixed term of years.[5]

The testimony here was that the rent per acre for the 1990 crop was substantially greater than the rent Mr. Watts agreed to charge for 1992 if Mr. Tiegs and the Olberdings exercised their options. In essence, the rent was front loaded because 1990 was when Mr. Watts needed the money to develop the wells. On their part, Mr. Tiegs and the Olberdings were amenable to this arrangement because if they decided to exercise the options their averaged costs for the virgin acreage would be quite reasonable.

Mr. Tiegs's testimony is illustrative:

Q. What did Mr. Watts indicate to you and LC Farming that he would do as far as equipment and supply of water?

A. The supply of water, he was going to drill the necessary wells. He was going to put on new Valley center pivots, new mainline, turnkey operation.

Q. How did the price of $750 an acre in 1990 and the $350 an acre in 1992 with an option come about?

A. The $750 came about because I think that's what he needed probably to develop it, and I think he wanted to get the most money possible. It was a front-loaded lease.

Q. You paid more for the first year than what you would otherwise to get the second year cheaper?

---

[5]A parallel line of reasoning is found in decisions enforcing on equitable grounds deeds which fail to comply with the statute of frauds. *See Beckendorf v. Beckendorf*, 76 Wn.2d 457, 465, 457 P.2d 603 (1969); *Carson v. Thompson*, 10 Wash. 295, 298, 38 P. 1116 (1894).

A.   Yeah. I think if you average it right out between the two years, you've got the factor that he paid the power on it, and you got to keep that in the formula a little bit because that enters into all these leases because normally you don't—the farmer pays his own power or he pays his own water, and that 750 is with the water paid.

. . . .

Q.   Was that a valuable option?

A.   It was a valuable option to us. One of the reasons is that, in my opinion, that we paid part of the rent for 1992 in 1990.[6]

Boise's position is that the Supreme Court's holding in *Greaves v. Medical Imaging Sys., Inc.*, 124 Wn.2d 389, 879 P.2d 276 (1994) prevents Mr. Tiegs and the Olberdings from using an estoppel theory to save the lease option; i.e., *Greaves* implicitly overrules *Franklin* and *Mobley*. In *Greaves*, 124 Wn.2d at 398, the Supreme Court refused to adopt Restatement (Second) of Contracts § 139 (1981), which in certain situations makes enforceable oral promises that the promisor reasonably should expect to induce reliance by the promisee and does induce reliance.

Shortly after deciding *Greaves*, the Supreme Court refused to adopt section 129 of the Restatement (Second) of Contracts to enforce an easement not in compliance with the statute of frauds because it did not sufficiently describe the servient estate. *Berg v. Ting*, 125 Wn.2d 544, 559, 886 P.2d 564 (1995). Section 129 is a particular application of section 139 to land contracts. It provides:

A contract for the transfer of an interest in land may be specifically enforced notwithstanding failure to comply with

---

[6]See also Fred Olberding's testimony:

"Q.   Was your 1992 farming option part of a total overall package?

"A.   Yes. It was all part of what we were doing and negotiating and included in the lease at that time.

"Q.   Was any portion of the dollars that you paid for 1990 related to the 1992 farming?

"A.   Oh, yes, I think so."

the Statute of Frauds if it is established that the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement.

RESTATEMENT (SECOND) OF CONTRACTS § 129 (1981). *Berg*, 125 Wn.2d at 560, rejected use of section 129 because it does not require the court to examine any of the three factors Washington courts have traditionally recognized as evidence of part performance. Those factors are:

(1) delivery and assumption of actual and exclusive possession; (2) payment or tender of consideration; and (3) the making of permanent, substantial and valuable improvements
. . . .

*Berg*, 125 Wn.2d at 556 (quoting *Kruse v. Hemp*, 121 Wn.2d 715, 724-25, 853 P.2d 1373 (1993)).[7] The court held that application of section 129 "would run counter to the evidentiary function underlying this state's part performance doctrine." *Berg*, 125 Wn.2d at 561. *Berg* observed that, in the case before it, "[n]othing about the consideration given, unique or otherwise, reveal[ed] anything about any real property transaction, and certainly nothing about the servient estate." *Id.* at 561.

In contrast, the evidence of the consideration paid here indicates the parties intended Mr. Tiegs and the Olberdings would have the option of renewing the lease for a second year. While instruction 17 defined the term "estoppel" as detrimental reliance, rather than part performance, its application to the facts of this case is the same. Evidence of Mr. Tiegs's and the Olberdings' part performance (i.e., payment of the front-loaded rent) is the same evidence used by the jury to conclude Boise and Mr. Watts were estopped to deny the option. There was no error.

(c) Mutual Mistake

---

[7]Not all three factors need be present in every case. *Berg*, 125 Wn.2d at 557-58.

Boise next contends that the parties to the lease assumed uncontaminated water was available, and that this assumption was material to the contract. It reasons it has no liability under the lease because Mr. Watts could have terminated the lease based on the parties' mutual mistake.

■ ■ "A contract is voidable on grounds of mutual mistake when both parties independently make a mistake at the time the contract is made as to a basic assumption of the contract, unless the party seeking avoidance bears the risk of the mistake." *Bennett v. Shinoda Floral, Inc.,* 108 Wn.2d 386, 396, 739 P.2d 648 (1987). A party who is aware he has only limited knowledge of the facts but treats his limited knowledge as sufficient bears the risk of mistake. *Bennett,* 108 Wn.2d at 396. "In such a situation there is no mistake. Instead, there is an awareness of uncertainty or conscious ignorance of the future." *Bennett,* 108 Wn.2d at 396.

■ Although Mr. Watts did not expressly guarantee water quality in the lease, it is an implied covenant. Implied covenants are not favored, but the courts give them effect if certain requirements are satisfied. Those requirements are:

> (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.

*Scott v. Blanchet High Sch.,* 50 Wn. App. 37, 46, 747 P.2d 1124 (1987) (quoting *Fuller Mkt. Basket, Inc. v. Gillingham & Jones, Inc.,* 14 Wn. App. 128, 134, 539 P.2d 868, *review denied,* 86 Wn.2d 1004 (1975)), *review denied,* 110 Wn.2d 1016 (1988).

Here, the parties testified they did not expect any difficulty regarding water quality. It is logical to conclude the parties intended the contract would be void if the only available water was contaminated. Producing a crop requires a substantial amount of work *before* irrigation commences. It strains reason to believe Mr. Tiegs and the Olberdings would have agreed to accept the risk of contamination. Moreover, it would be commercially unreasonable for Mr. Watts to believe they had done so. In these circumstances, the risk of any mistake by the parties as to water quality rested with Mr. Watts.

The court did not err when it refused to give Boise's proposed instruction on mutual mistake. Mr. Watts had a duty to supply uncontaminated irrigation water, and, accordingly, bore the risk if he could not supply it.

(d) Estoppel to Exercise Option

Finally, Boise argues Mr. Tiegs and the Olberdings were estopped to exercise the 1992 option, given their cause of action that alleged the irrigation water for the leased property was contaminated.

Although Mr. Tiegs and the Olberdings went through the motions of exercising their option when they notified Boise of their intent to do so, they did not need to exercise it to secure damages for its loss. The contaminated groundwater was a breach of the lease, which included the option for 1992. That breach was the basis for their prayer for damages. Performance of the lease provision that they give notice of intent to exercise the option was not required because by that time Mr. Watts had breached his implied promise to supply water of sufficient quality to grow the lessees' potato crop. The argument is without merit.

Accordingly, we hold the trial court properly submitted to the jury the claim for loss of the 1992 lease option.

Third, did the court erroneously instruct the jury to consider Mr. Tiegs's and the Olberdings' lost profits when it calculated the damage, if any, flowing from the alleged breach of the 1992 lease option?

Instruction 19 stated the measure of damages for loss of the lease option for 1992. It read in part:

> If you find for the plaintiffs, Tiegs and Olberding partnership, *you may consider the market value of the potato crop they would have raised in the 1992 crop year* reduced by any expenses of producing, harvesting and marketing the crops which were not actually incurred by the plaintiffs, but would have been incurred together with any rent expense that would have been incurred.

(Emphasis added.) Boise excepted to the instruction. The jury awarded Mr. Tiegs and the Olberdings $1,147,258 in lost profits for loss of the option.

Boise and Mr. Watts contend lost profits from a crop a lessee intended to plant on leased property can never be the measure of damages for failure to put the tenant in possession, because such profits are too speculative. They rely on CHARLES T. MCCORMICK, HANDBOOK OF THE LAW OF DAMAGES § 126, at 486 (1935), which states: "If the invasion merely prevents the plaintiff from planting his land, the measure is not the value of the hoped for crop, but the rental value of the land for the season." In support thereof, Professor McCormick cites *Dilday v. David*, 178 Ark. 898, 12 S.W.2d 899, 900 (1929).

*Dilday* is concerned as much about the duty to mitigate as about whether rental value is the sole measure of such damages. There, the court held:

> If it was discovered in 1925 that the pump was inadequate and would not meet the guaranty under which it was sold, then defendant should, *in mitigation of his damages* for breach of the guaranty, have ceased to rely upon it. He did not have the right to continue planting an acreage in excess of the known capacity of the pump to water, with the expectation of calling upon his guarantor to make good any deficiency between the crop made and the one which would have been made with a pump of the guaranteed capacity. A different measure of damages would apply.

*Dilday*, 12 S.W.2d at 900 (emphasis added).

Other cases cited by the parties are also distinguishable. For example, in *Woodward v. Blanchett*, 36 Wn.2d 27, 30, 216 P.2d 228 (1950), the lessor took possession of the property and thereafter harvested a crop he had seeded during the unexpired term of the lease. The court observed that in an appropriate case "evidence as to the market value of *crops actually produced* during the unexpired term would be relevant in establishing damages where the lessee's share of crops actually being grown by him had been destroyed or harvested by the lessor." *Woodward*, 36 Wn.2d at 39 (emphasis added). While recognizing lost profits may be awarded in the foregoing situation, when specially pleaded and shown with a reasonable degree of certainty, the court concluded the evidence before it did not meet such standard. Rather, the evidence showed the lessor by dint of hard work reclaimed the fields from the weeds, and his actions did not fairly indicate what the lessees would have done with the property had they remained in possession. *Woodward*, 36 Wn.2d at 40.

Similarly, the court in *Pappas v. Zerwoodis*, 21 Wn.2d 725, 735, 153 P.2d 170 (1944) held the tenant had not shown with a reasonable degree of certainty the profits allegedly lost by the tenant's business due to the landlord's failure to repair the building occupied by the business. The court's assessment of the evidence offered is instructive:

> There was no showing of the amount of profits that appellant had customarily been making, nor was there any convincing evidence concerning the amount of loss of profits due to the condition of the premises. Appellant testified that the bookkeeper's receipts showed a loss of ten or eleven dollars a day, but no books were produced in court, nor was any explanation given as to how the loss was computed.

*Pappas*, 21 Wn.2d at 735. It concluded the foregoing was insufficient to establish the tenant had sustained a loss of profits. *Pappas*, 21 Wn.2d at 735. *See also* McCormick, *supra* § 28, at 104-06; 11 Samuel Williston, A Treatise on the Law of Contracts § 1404A, at 566 (Walter H.E. Jaeger ed., 3d ed. 1968).

■ Washington courts have not directly held that lost profits are an appropriate measure of damages in situations in which the tenant is prevented from conducting his business, be it farming or another enterprise. But, other jurisdictions have upheld damage awards for the loss of profits from a future crop. *See, e.g., Miller v. Cudahy Co.*, 858 F.2d 1449, 1457 (10th Cir. 1988), *cert. denied*, 492 U.S. 926 (1989); *Fox Grain & Cattle Co. v. Maxwell*, 267 Mont. 528, 885 P.2d 432 (1994); *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1348 (Colo. Ct. App. 1986). In *Wilson*, the court upheld an award of damages to the lessees based upon lost profits they would have realized from planting, harvesting, and selling a barley crop, but for the lessor's breach. The court stated that such awards are appropriate for breach of contract "if they are reasonably ascertainable based on past experience and not too speculative, remote, or contingent." *Wilson*, 714 P.2d at 1348. The following was deemed sufficient to satisfy those criteria:

> [The] lessee presented evidence regarding its 1982 production of barley from a tract of land located one-half mile from the disputed acreage. This land had been prepared and worked in the same manner as proposed for lessor's land and was subject to the same growing conditions. It is important to note that the sprinkling system installed on both tracts standardized many of the procedures used in farming them, because water, fertilizer, and weed-controlling chemicals were all applied through the system. That both tracts had been planted in corn before rotation to barley, in addition to their proximity, indicates that soil conditions would have been similar. There was no evidence that weather conditions in 1982 were different than those in 1981. Although lessors introduced evidence regarding actual production at a loss of oats and alfalfa from their acreage, there was substantial evidence that these crops had been planted late by relatively inexperienced farmers.

*Wilson*, 714 P.2d at 1348.

Our Supreme Court's prime concern in this area is that damages are awarded only when the proof of their amount is reasonably certain. *See Woodward*, 36 Wn.2d 27; *Pap-*

*pas,* 21 Wn.2d 725. The holdings in *Miller, Fox Grain* and *Wilson* are a logical extension of *Woodward* and *Pappas,* and we adopt their rationale here. We hold future lost profits are an appropriate measure of damages for breach of a farm lease, if the plaintiff can establish their amount with a reasonable degree of certainty.

The question, then, is whether the proof of Mr. Tiegs's and the Olberdings' lost profits meets that test. Fred Olberding testified he and his brother have consistently reaped more tonnage per acre than the state average. In making this point, he compared data from state records with profits they posted from acreage they planted in potatoes in Walla Walla County. He expected even more tonnage from virgin ground. Exhibit 100 shows projected lost profits in 1992, based upon the amount of acres they intended to plant, the types of potatoes they intended to grow, and projected sale prices and costs. Mr. Olberding estimated they lost $3,167,650 in profits for that season. As stated above, the jury awarded them $1,147,258 in lost profits for 1992.

Mr. Olberding's testimony and the exhibits he references provide sufficient evidence to support instructing the jury to use lost profits as the measure of the damages suffered by Mr. Tiegs and the Olberdings for loss of the 1992 option. As in *Wilson,* his comparison to other property farmed by them coupled with the information from state records provided the jury a reasonably certain basis to estimate their profits. There was no error.

Affirmed.

Pursuant to RCW 2.06.040, the remaining contentions and the court's opinion as to them are without precedential value and will not be published.

MUNSON and THOMPSON, JJ., concur.

Review granted at 131 Wn.2d 1014 (1997).