[No. 19509-7-II. Division Two. September 26, 1997.]

*In the Matter of the Estate of* MARJORIE MAE CATTO.

ELIZABETH OWNBEY, ET AL., *Appellants*, v. JOHN CATTO, *Respondent.*

*Harlan C. Stientjes*, for appellants.
*Paul M. Acheson*, for respondent.

Roof, J.* — Marjorie Catto separated from her husband, disinherited him by will, and filed for divorce. One day after filing for divorce, she died. At trial concerning the disposition of her estate, most of her property was awarded to her husband, Jack, by virtue of a community property survivorship agreement executed during their marriage. Marjorie's heirs (Ownbey) appeal the judgment, arguing that the Agreement was void because of the inconsistent will, and because the marriage had become defunct. We affirm, holding that the Agreement was still effective at the time of Marjorie's death.

I

In late 1988, Jack Catto and Marjorie Hansen began dating.[1] On December 5, 1988, they executed a prenuptial agreement. On December 27, 1988, they were married in Tucson, Arizona. On April 25, 1989, Jack and Marjorie executed a community property and survivorship agreement,

---

*Judge Jay B. Roof is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

[1]Apparently, Marjorie was elderly, and had twice been widowed.

(the Agreement). The Agreement provides in pertinent part:

### I.

That all property of whatsoever nature or description whether real, personal or mixed and wheresoever situated, now owned or hereafter acquired by them or either of them shall be considered and is hereby declared to be community property upon the death of either party.

### II.

That upon the death of either of the aforementioned parties, title to all community property as herein defined shall immediately vest in fee simple in the survivor of them.

On September 27, 1992, Marjorie separated from Jack by moving to Iowa. On November 15, 1992, Marjorie relocated to Phoenix to receive health care for a serious health problem.

After moving, Marjorie asked Jack to help her segregate some of their joint and community property that had become commingled during their marriage.[2] After consulting his attorney, Jack refused. On December 16, 1992, he recorded the Agreement with the King County Auditor.[3]

On January 18, 1993, Marjorie prepared a new will disinheriting Jack and revoking all her prior wills. She also caused her joint interest in some Colorado property to be conveyed to a straw man and then reconveyed to her as separate property. On January 25, 1993, Marjorie filed an action for dissolution in Mason County Superior Court. One day later, she died.

Marjorie's will was admitted to probate in Mason

---

[2]The parties refer to various parcels of property in their briefs. The record is not entirely clear as to the facts relating to the character and status of these properties. However, analysis of the assigned errors in this case does not require consideration of these facts.

[3]This date is not found in the record. However, the parties agree that it was mid-December, 1992.

County and Jack was appointed co-executor of the estate. Jack claimed that there were no assets in the estate because the community property agreement vested him with title to all of Marjorie's property. The various heirs under her will (Ownbey) claimed that the Agreement was void because of the inconsistent will and because the marriage was defunct.

A trial was held on the sole issue of whether the marriage was defunct. The jury found that on the date of Marjorie's death, the marriage was defunct. The trial court ruled that despite this fact, the vesting provisions of the Agreement were effective at the time of death. Both parties appeal from the judgment. Ownbey argues that the trial court erred in determining that the Agreement was effective at the time of death. Jack argues that the trial court erred by refusing his proposed jury instruction on the definition of a defunct marriage.

## II

We first consider whether the vesting provisions of the Agreement were effective at the time of Marjorie's death. The community property agreement statute, RCW 26.16.120,[4] enables husbands and wives to enter into community property agreements concerning the status and disposition of their property, to take effect upon the death of either. *In re Estate of Wittman*, 58 Wn.2d 841, 843-44, 365 P.2d 17 (1961). Such an agreement is an enforceable contract and is not governed by laws relating to wills. *Estate of Wittman*, 58 Wn.2d at 843. The contracts are completely executed when one of the parties to the contract dies. *Estate of Wittman*, 58 Wn.2d at 843. At this

---

[4]The statute reads in pertinent part:

Nothing contained in any of the provisions of this chapter, or in any law of this state, shall prevent the husband and wife from jointly entering into any agreement concerning the status and disposition of the whole or any portion of the community property, then owned by them or afterwards to be acquired, to take effect upon the death of either. . . .

RCW 26.16.120 (revisor's note omitted).

time title to the community property vests as the sole and separate property of the survivor. *Estate of Wittman*, 58 Wn.2d at 843. This property cannot be devised or bequeathed by will by either spouse. *Estate of Wittman*, 58 Wn.2d at 843.

Here, Ownbey essentially makes three arguments that the Agreement was not effective at the time of Marjorie's death: (1) the Agreement was rescinded by the parties; (2) the Agreement contained an implied term terminating the effectiveness of the Agreement when the marriage became defunct; and (3) the Agreement is void because Marjorie did not have independent counsel at the time it was signed. We address these arguments in turn.

### 1. Rescission

Ownbey first argues that the community property agreement was rescinded after the parties were separated. A community property agreement, like other contracts, will remain in effect until it is rescinded by the parties to the contract. *Estate of Wittman*, 58 Wn.2d at 843. An agreement of rescission must itself be a valid agreement. Thus, all parties to the contract must assent to the rescission and there must be a meeting of their minds. *Estate of Wittman*, 58 Wn.2d at 844. Uncommunicated subjective mutual intention to abandon is not deemed a meeting of the minds. *In re Estate of Lyman*, 7 Wn. App. 945, 949, 503 P.2d 1127 (1972), *aff'd*, 82 Wn.2d 693 (1973). A meeting of the minds may be shown by conduct, however, where the conduct of one party is inconsistent with the continued existence of the contract, and the conduct is known to and acquiesced in by the other. *Lyman*, 7 Wn. App. at 948-49.

These rules were applied in *Lyman*. In *Lyman*, the court held that a community property agreement was not rescinded by the conduct of the parties where the wife filed for divorce and the husband executed a will inconsistent with the provisions of the agreement. *Lyman*, 7 Wn. App. at 949. The wife's action was held not to demonstrate

an intent to abandon the agreement.[5] *Lyman*, 7 Wn. App. at 950-51. The husband's execution of the will showed only his unilateral intent to abandon the agreement. Because his wife had no knowledge of the new will, the requisite mutuality of intent was not shown, and the agreement was not rescinded. *Lyman*, 7 Wn. App. at 949.

In this case, Marjorie's intention to abandon the contract was arguably communicated to Jack by her conduct in filing for divorce or by drafting the new will. Ownbey fails to allege, however, that Jack manifested any intent (whether by conduct, express assertion, or acquiescence) to rescind the Agreement. In fact, Ownbey appears to concede that Jack understood his rights under the Agreement and at all times intended that it remain effective. Ownbey argues, however, that Marjorie's unilateral intent to abandon the Agreement should be considered sufficient to effect a rescission of the Agreement. In essence, Ownbey requests that this court overturn the strong precedent cited above. We decline this request.

### 2. Construction

Ownbey next argues that the Agreement should be construed as having an implied clause terminating the effectiveness of the Agreement after the marriage becomes defunct.

 Rules of contract construction apply to community property agreements. *In re Estate of Wahl*, 31 Wn. App. 815, 644 P.2d 1215 (1982). The goal of construing a contract is to effectuate the parties' mutual intent. *Harris v. Ski Park Farms, Inc.*, 120 Wn.2d 727, 742, 844 P.2d 1006 (1993). Mutual intent can be established directly or by inference. *Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977). But it must always be based on the parties' objective manifestations. *Retail Clerks Health &*

---

[5] A community property agreement will be considered an asset in the dissolution proceeding which will be equitably divided by the court like any other asset. *Lyman*, 7 Wn. App. at 950-51.

*Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944, 640 P.2d 1051 (1982). In cases involving a written agreement, objective manifestations may be discovered from the agreement or the context in which it was executed. *Harris*, 120 Wn.2d at 742.

Here, the Agreement contains no express clause terminating the effectiveness of the agreement after the marriage becomes defunct. In addition, such a provision cannot be implied from the language of the Agreement itself because its operative terms are not logically inconsistent with the existence of a defunct marriage. Ownbey argues that a termination clause can fairly be implied from the context in which the Agreement was entered. This argument is based on Ownbey's belief that a husband and wife entering such an agreement would rarely, if ever, have intent that the agreement remain effective after the parties separate. Although such an intent may be rare, we find it apparent that there are a variety of circumstances in which a person has separated from a spouse but still intends that the spouse receive the community property at death. Therefore, because it is conceivable that the parties intentionally omitted a termination clause frequently found in community property agreements, we refuse to imply the existence of such a clause.[6] The community property and survivorship agreement drafted by the parties preserved the integrity and the right to own separate property until the time of death. As such, either party was free to transfer separate property before death.

### 3. Independent Counsel

Ownbey also argues that the community property agreement was void because Marjorie was not represented

---

[6]Ownbey also urges this court adopt the view of Professor Oltman, who suggests that Washington courts imply the existence of termination clauses in community property agreements. *See* William Oltman, *The Implied Termination of Community Property Agreements upon Permanent Separation*, 14 U. PUGET SOUND L. REV. 53 (1990). Since the instant case deals only with the third prong of the community property agreement, i.e., terminating disposition, for the reasons stated above, we decline to adopt this approach.

by independent legal counsel at the time of its execution. (Jack's attorney was the only one present.) Ownbey acknowledges that the case law does not require that each party have independent legal counsel to execute a community property agreement.[7] Ownbey argues, however, that the court should impose this requirement in this case because, considering the circumstances and Marjorie's age, there was potential for abuse with the Agreement. Although Ownbey alleges various instances of abuse after marriage, Ownbey does not cite to any evidence indicating that Marjorie did not understand the nature of the Agreement or that she was coerced into signing it. The Agreement was simple and understandable. It cannot be avoided now.

### 4. Jury Instruction

We next consider whether the trial court erred by refusing Jack's instruction on the definition of a defunct marriage. On cross-appeal, Jack argues that the trial court erred by refusing his proposed instruction on the definition of a defunct marriage: "a marriage is a 'defunct' marriage when both of the parties by their conduct have exhibited a decision to renounce the community with no intention of ever resuming the marital relationship." In fact, this is exactly the instruction that was given by the court: "A defunct marriage exists where . . . . the parties through their actions have exhibited a decision to renounce the community with no intention of ever resuming the marital relationship."[8] Jack's reply brief concedes his mistake, but surprisingly continues to assert without

---

[7]Ownbey points out that under certain circumstances, the courts have required independent counsel in the case of a prenuptial agreement. For example, in *Friedlander v. Friedlander*, 80 Wn.2d 293, 494 P.2d 208 (1972), the court held that a prenuptial agreement was void where the husband failed to make full disclosure concerning the extent of his assets, and the wife had not received independent advice informing her of the material facts of the transaction. In this case, there is no allegation that Marjorie was not aware of all the material facts surrounding the Agreement.

[8]Jack mistakenly asserts that the trial court gave the following instruction:

A defunct marriage is a marriage where one of the spouses no longer has the desire to continue the marriage. If one of the parties to a marriage

explanation that the instruction was in error. His cross-appeal must fail.

For the reasons stated above, we affirm.

BRIDGEWATER, A.C.J., concurs.

MORGAN, J. (dissenting) — As this case well illustrates, the community property agreement (CPA) can be an insidious instrument if the parties fail to state how it can be revoked. The problem warrants attention from the Legislature, the Supreme Court, or both. Pending such attention, however, it is my view that the law allows this court, under the particular circumstances of this case, to give effect to the decedent's wishes concerning the distribution of her property.

In general, a CPA is governed by RCW 26.16.120[9] and contract principles.[10] Usually, though perhaps not always, it contains both a conversion prong and a testamentary

demonstrates through his or her actions a decision to renounce the marital community with no intention of ever resuming the marital relationship, the marriage is a defunct marriage.

This instruction was not given.

[9]RCW 26.16.120 provides:

Nothing contained in any of the provisions of this chapter or in any law of this state, shall prevent the husband and wife from jointly entering into any agreement concerning the status or disposition of the whole or any portion of the community property, then owned by them or afterwards to be acquired, to take effect upon the death of either. But such agreement may be made at any time by the husband and wife by the execution of an instrument in writing under their hands and seals, and to be witnessed, acknowledged and certified in the same manner as deeds to real estate are required to be, under the laws of the state, and the same may at any time thereafter be altered or amended in the same manner: *Provided, however,* That such agreement shall not derogate from the right of creditors, nor be construed to curtail the powers of the superior court to set aside or cancel such agreement for fraud or under some other recognized head of equity jurisdiction, at the suit of either party.

[10]*In re Marriage of Schweitzer,* 132 Wn.2d 318, 328, 937 P.2d 1062 (1997); *In re Estate of Brown,* 29 Wn.2d 20, 27, 185 P.2d 125 (1947); *In re Estate of Lyman,* 7 Wn. App. 945, 948, 503 P.2d 1127 (1972), *aff'd,* 82 Wn.2d 693 (1973); William Oltman, *The Implied Termination of Community Property Agreements,* 14 U. PUGET SOUND L. REV. 53, 53-54 (1990).

prong.[11] Depending on the particular wording, the conversion prong may convert separate property in some or all of the following categories: (1) separate property owned at the time the CPA is formed, (2) separate property acquired after the CPA is formed but before the first spouse dies, and (3) separate property owned when the first spouse dies.[12] Thus, the conversion prong may operate when the CPA is formed; when, after the CPA is formed, an asset is acquired; or when the first spouse dies. In contrast, the testamentary prong vests community property in the surviving spouse, and thus operates when the first spouse dies. The fundamental difference between the conversion prong and the testamentary prong is that the former *creates* community property, while the latter *distributes* it.

With this background, I turn to the facts of this case. On December 5, 1988, John A. Catto and Marjorie M. Hansen executed a prenuptial agreement. It provided that each would retain his or her separate property after marriage, and that each should be awarded his or her separate property if the marriage were ever dissolved. Catto's separate property included real estate in Potlatch, Washington. Hansen's separate property included real estate in Glen Springs, Colorado.

On December 27, 1988, Hansen and Catto were married.

---

[11]Professors Cross and Oltman have said that a CPA often has three prongs— one that converts separate property owned when the CPA is formed, a second that converts separate assets acquired thereafter but before either spouse dies, and a third that vests all community property in the surviving spouse. *See Marriage of Schweitzer*, 132 Wn.2d at 324 (citing Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 WASH. L. REV. 13, 101 (1986)). If this three-prong framework is used, however, it is necessary to recognize that the first and second prongs are similar in that each converts separate property, although at a different time from the other. It is also necessary to recognize that neither the first nor second prong takes account of the fact that a CPA may convert separate property only when one spouse dies. Here, it seems better to conceptualize a CPA as having a conversion prong and a testamentary prong, then recognize that the conversion prong can operate at different times, depending on its wording.

[12]*Compare Marriage of Schweitzer*, 132 Wn.2d at 325, *and In re Estate of Wittman*, 58 Wn.2d 841, 842, 365 P.2d 17 (1961), on the one hand, *with In re Estate of Brown*, 29 Wn.2d at 24, and the CPA in this case, on the other.

On April 25, 1989, Hansen and Catto signed a CPA.[13] It provided in part:

## I.

That all property of whatsoever nature or description whether real, personal or mixed and wheresoever situated, now owned or hereafter acquired by them or either of them shall be considered and is hereby declared to be community property upon the death of either party.

## II.

That upon the death of either of the aforementioned parties, title to all community property as herein defined shall immediately vest in fee simple in the survivor of them.[14]

As can be seen, this CPA had a conversion prong (paragraph I) that was designed to change separate property to community property—but not until the first spouse died. It also had a testamentary prong (paragraph II) that was designed to operate simultaneously with the conversion prong and, at that time, to vest all community property in the surviving spouse. The CPA lacked a clause stating how it could be rescinded or revoked.

On November 2, 1989, Catto and Hansen bought a house in Hoodsport, Washington. Presumably, that house was community property, because it was acquired during marriage.[15]

On December 24, 1991, Catto conveyed to Hansen, "as

---

[13]On April 24, 1989, a day before executing their CPA, Catto and Hansen executed reciprocal wills. Catto's will gave Hansen a life estate "in all of [his] property and assets," (Ex. 3) and his children the remainder in equal shares. Hansen's will gave Catto a life estate "in all of [his] property and assets," (Ex. 4) and her children the remainder in equal shares. These wills are immaterial here, however, because Hansen's was revoked when, on January 18, 1993, she executed another, inconsistent will.

[14]Ex. 1.

[15]See RCW 26.16.030; In re Marriage of Short, 125 Wn.2d 865, 870, 890 P.2d 12 (1995).

community property,"[16] an undivided one-half interest in the Potlatch property. On January 29, 1992, Hansen conveyed the Colorado property to Catto and herself "as joint tenants with right of survivorship."[17]

In September 1992, Catto and Hansen separated. Hansen's children allege that Catto abused Hansen during the marriage, but that has not been litigated or proved.

After separation, Hansen offered to quitclaim to Catto her interest in the Potlatch property if he would, in exchange, quitclaim to her his interest in the Colorado property. She also proposed that they sell the Hoodsport property and split the proceeds. Catto refused.

On January 18, 1993, Hansen executed a new will in which she revoked all prior wills and bequeathed her property to her children. She left nothing to Catto.

At about the same time, Hansen "caused her interest in the Colorado property to be conveyed out to a straw man and reconveyed to her."[18] The effect, according to the trial court's undisputed reading of Colorado law, was to transform the Colorado property into a tenancy in common, with Hansen and Catto each owning a one-half interest as his or her separate property.

On January 25, 1993, Hansen sued for dissolution of marriage. The next day, she died.

When Hansen's children sought to probate the will she had executed on January 18, 1993, Catto interposed the CPA. He said it had converted all of Hansen's separate property into community property at the moment of her death; that it had vested all community property in him; and that there were no assets subject to probate. Hansen's children responded that the CPA had not operated (1) because the Hansen-Catto marriage was defunct before Hansen died, and a CPA does not operate after a marriage

---

[16]Finding of Fact 5; Clerk's Papers at 8.

[17]Findings of Fact 6 and 9; Clerk's Papers at 8.

[18]Finding of Fact 9; Clerk's Papers at 9.

is defunct; and (2) because Hansen had unilaterally revoked the CPA following her separation from Catto.

The trial court held a jury trial to decide whether the marriage was "defunct"[19] before Hansen died. The jury answered in the affirmative.

After receiving the jury's verdict, the trial court made two rulings pertinent here. One concerned the CPA's conversion prong, while the other concerned its testamentary prong.

The trial court ruled that when Hansen and Catto formed their CPA, they intended to create community property while they had a community relationship, but not after they had ceased to have a community relationship. Accordingly, the conversion prong had terminated when, before Hansen's death, their marriage became defunct. None of Hansen's separate property had been converted to community property at the time of her death, and regardless of whether the testamentary prong had been revoked, Hansen's children were entitled to take her separate assets under her January 18 will, including her one-half interest in the Colorado real estate, her personal property acquired before marriage, her car, and her separate bank accounts.

---

[19]According to some cases, a marriage is "for all practical purposes 'defunct,' " even though it has not been legally dissolved, when the parties have ceased to have a "community" relationship, and retain only a skeletal "marital" relationship. *Aetna Life Ins. Co. v. Bunt*, 110 Wn.2d 368, 372, 754 P.2d 993 (1988); *see also Togliatti v. Robertson*, 29 Wn.2d 844, 852, 190 P.2d 575 (1948); *Oil Heat Co. v. Sweeney*, 26 Wn. App. 351, 354, 613 P.2d 169 (1980); Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 WASH. L. REV. 13, 33 (1986). According to other cases, a marriage is defunct when the parties have *permanently* separated, Cross, 61 WASH. L. REV. at 34, but not merely because they have *physically* separated. *Bunt*, 110 Wn.2d at 372; *Aetna Life Ins. Co. v. Boober*, 56 Wn. App. 567, 570, 784 P.2d 186 (1990); *Oil Heat Co.*, 26 Wn. App. at 354. At bottom, however, the question "is whether the parties by their conduct have exhibited a decision to renounce the community, with no intention of ever resuming the marital relationship." *In re Marriage of Nuss*, 65 Wn. App. 334, 344, 828 P.2d 627 (1992) (quoting *Oil Heat Co.*, 26 Wn. App at 354); *Boober*, 56 Wn. App. at 571. Here, the trial court instructed the jury, "A defunct marriage exists where it can be determined that the spouses, by their conduct, indicate that they no longer have a will to union. The test is whether the parties through their actions have exhibited a decision to renounce the community with no intention of ever resuming the marital relationship." Clerk's Papers at 20.

Additionally, the trial court ruled that even though Hansen and Catto had intended that the conversion prong terminate when their marriage became defunct, they had not intended that the testamentary prong terminate also. Thus, Catto was entitled to take, by virtue of the testamentary prong, those assets that had been community property before Hansen's death, including the Hoodsport real estate and the Potlatch real estate.[20]

On appeal, no one assigns error to the trial court's ruling regarding the conversion prong. This seems both reasonable and appropriate, given that virtually no one who forms a CPA intends to create community property after he or she no longer has a community relationship (i.e., after his or her marriage is defunct).[21]

Hansen's children, however, assign error to the trial court's ruling regarding the testamentary prong. Although they assert many arguments, the two worthy of discussion are (1) that the testamentary prong was terminated when the marriage became defunct, and (2) that the testamentary prong was unilaterally revoked when Hansen executed her January 18 will. Hereafter, I refer to the first as an implied termination argument, and to the second as a unilateral revocation argument.

In my view, the implied termination argument is valid, at least where, as here, the conversion prong of the CPA in question does not change the character of any property before the parties' marriage becomes defunct. As Professor Oltman has said in the law review article cited by the majority,

> At the time spouses execute a community property agreement (whether it applies to existing property, future acquisi-

---

[20]In a third ruling, the trial court held that Hansen and Catto had never mutually rescinded their CPA. The majority holds that this ruling was correct, and I agree.

[21]It is even arguable that community property *cannot* be created when there is no longer a community relationship (i.e., after a marriage becomes defunct). *See Bunt*, 110 Wn.2d at 372 ("It is the fact of community that gives rise to the community property statute; when there is no 'community', there can be no community property."). The trial court did not address this argument, nor do I.

tions, or at-death distribution), it is premised to a large extent upon the existence of the underlying joint venture aspect of their marriage. It is certainly possible that the parties could agree to the conversion of all separate property to community property and the distribution of community property to the survivor upon the death of the first to die *while they are permanently separated,* but it is very unlikely that they would do so. It would seem almost certain that the provisions in the agreement dealing with property conversions and distributions are dependent upon an ongoing marriage, a relationship in which the product of each person's efforts is shared equally. As has been discussed above, that is simply not the case when there has been a permanent separation. . . .[22]

To me the validity of these statements is self-evident, and even the majority concedes that it is "rare" for a husband and wife to intend, when they form a CPA, that any part of the CPA continue to operate after permanent separation. I would hold that unless a CPA expressly provides otherwise,[23] its testamentary prong ceases to operate if, when the parties' marriage becomes defunct, the conversion prong is wholly executory. I express no opinion on the more difficult problem of what to do if, when the parties' marriage becomes defunct, the conversion prong is partly or wholly executed.

In my view, the unilateral revocation argument may also be valid, where the CPA is worded so that the conversion prong does not operate until one spouse dies, and thus is wholly executory when the unilateral revocation is effected. In *Allen v. Dillard*,[24] one of the questions was whether a contract to make mutual wills could be unilaterally revoked. After distinguishing between a revocation unilaterally attempted after one party died and a revocation unilaterally attempted while both parties were alive,

---

[22]Oltman, 14 U. Puget Sound L. Rev. at 66.

[23]In the "rare" case in which the parties intend their CPA to operate even after their marriage becomes defunct, it is reasonable to think that they will say so in their agreement.

[24]15 Wn.2d 35, 129 P.2d 813 (1942).

and stating that it was addressing only the latter situation, the Supreme Court quoted with approval the following passage from Corpus Juris:

> "An agreement to make mutual wills, or the execution of wills in pursuance of such an agreement, does not bind the testators to keep the property, covered thereby, for the intended beneficiaries under such wills, or prevent them from making such other disposition of it, either inter vivos or by will, as they may desire and mutually agree, while both or all still live. Moreover, while both or all of the parties to such an agreement are yet alive, any party may recede therefrom, and revoke his will or make a different disposition of his property, on giving proper notice to the other party or parties of his act in so doing, or where such other or others have actual knowledge thereof; but a revocation or alteration of his will by one of the parties to such an agreement in secret, or without notice to, or the knowledge of, the other or others, although all are yet alive, does not release such party from his obligations under the agreement, and it remains enforceable against him."[25]

The justification for this rule, the court went on to explain,

> "is to be found in the general desire to continue a man's power to alter the testamentary disposition of his property until his death, and the fact that no great harm is done to the other party since he can make a new will. The loss of his bargain by one party is not considered as undesirable as the loss of his power to make a will by the other. But if there is no notice, it seems clear that the innocent party is likely to suffer much more than merely the loss of his bargain."[26]

The court concluded by saying:

> It is the very essence of a will that, under ordinary circumstances, the same is revocable, either by destroying it or making a new will. A document of a testamentary nature which cannot be revoked is something more than, and different

---

[25]*Allen*, 15 Wn.2d at 52 (quoting 69 C.J. § 2724, at 1301).

[26]15 Wn.2d at 52-53 (quoting Leo H. Hirsch, Jr., *Contracts to Devise and Bequeath*, 9 WIS. L. REV. 267, 275 (Apr. 1934)).

from, a will. It would seem that an understanding between two or more persons that they would execute mutual wills, and the subsequent execution of such wills, no present consideration passing, and no testator having subsequently altered his position to his detriment, relying upon the understanding, should be revocable during the lifetime of the parties, upon adequate notice of the revocation or intended revocation. In expressing this view, we do not intend to state a definite rule applicable in all cases.[27]

So long as the conversion prong of a CPA does not operate to change the character of any of the parties' property while both spouses are living, the entire CPA is equivalent to an interspousal contract to make joint and mutual wills. When spouses contract to make joint and mutual wills, each contracts to leave to the other whatever property he or she owns at the time of death. Similarly, when spouses form a CPA in which the conversion prong will not operate until one spouse dies, each spouse contracts to leave to the other whatever property he or she owns at the time of death.

When a CPA is equivalent to a contract to make joint and mutual wills, either spouse should have the right to revoke it, so long as the other spouse is not prejudiced, for the reasons set forth in *Allen v. Dillard*.[28] Moreover, as in *Allen*, prejudice is not shown merely because the other spouse is disappointed in not receiving the revoking spouse's property. Rather, prejudice requires a showing that the nonrevoking party was denied a fair opportunity to change his or her own testamentary scheme.[29] Giving timely notice of the revocation is one way to prevent prej-

---

[27]15 Wn.2d at 53-54.

[28]15 Wn.2d 35.

[29]*See Allen*, 15 Wn.2d at 52 (unilateral revocation of contract to make wills warranted, given "the general desire to continue a man's power to alter the testamentary disposition of his property until his death, and the fact that no great harm is done to the other party since he can make a new will").

udice, but there may be others as well, depending on the particular circumstances.[30]

Nothing said herein is contrary to *Estate of Wittman*,[31] or *In Re Estate of Lyman*,[32] the two cases cited by the majority in its discussion of mutual rescission. In each of those cases, the sole issue was whether to imply a mutual rescission from the parties' conduct.[33] In neither did a party argue, or the court consider, implied termination or unilateral revocation. In addition, *Wittman* is factually distinguishable for at least two reasons. First, the CPA was not wholly executory at the time of the wife's alleged revocation, because it was worded to convert the parties' property at the time it was formed. Second, the husband had no opportunity to adjust his affairs in light of the wife's alleged rescission, because he died without ever knowing of his wife's inconsistent will.[34]

In this case, I would accept the unilateral revocation argument if the record showed a lack of prejudice to Catto. It fails to show, however, whether he was prejudiced or not. More specifically, it fails to show whether Hansen gave him notice of her attempted unilateral revocation, or whether Catto, even without such notice, had a fair opportunity to revise his own testamentary scheme in light of Hansen's rejection of the CPA. Accordingly, I would hold that Hansen's share of the community property should be distributed to her children, pursuant to her

---

[30]*See Allen*, 15 Wn.2d at 54 ("we do not intend to state a definite rule applicable in all cases").

[31]58 Wn.2d 841.

[32]7 Wn. App. 945.

[33]I agree with the majority's use of these cases in the mutual rescission portion of its opinion.

[34]This seems true even though the husband executed his own inconsistent will. His will might or might not have been the same, had he executed it with knowledge of his wife's inconsistent will.

wishes as expressed in her will of January 18, 1993, but only because of the implied termination argument.[35]

Review denied at 134 Wn.2d 1017 (1998).

[35]I agree with the majority's treatment of the right-to-counsel and jury instruction issues.