25 P.3d 498 (2001)
106 Wash.App. 862
In the Matter of the Estate of Angeline V. BACHMEIER, Deceased.
Sandra L. Johnson, Appellant,
v.
John Bachmeier, Respondent.
No. 25344-5-II.
Court of Appeals of Washington, Division 2.
June 26, 2001.
*500 Jeffrey Paul Helsdon, Christopher Martin Constantine, McFerran & Helsdon P.S., Tacoma, for Appellant.
Kenneth E. Rossback, Tacoma, for Respondent.
*499 HOUGHTON, J.
The personal representative of Angeline Bachmeier's estate appeals from a trial court award of the estate to John Bachmeier. She argues that the testamentary prong of a community property agreement terminated by implication when the Bachmeiers' marriage became defunct. We reverse and remand for further proceedings.

FACTS
The Bachmeiers married in June 1966. In March 1977, they executed a standard form, three-pronged community property agreement. The agreement provided in pertinent part:
That, in consideration of the love and affection that each of said parties has for the other, and in consideration of the mutual benefits to be derived by the parties hereto, it is hereby agreed, covenanted, and promised:

I.
That all property of whatsoever nature or description whether real, personal or mixed and wheresoever situated now owned or hereafter acquired by them or either of them shall be considered and is hereby declared to be community property.

II.
That upon the death of either of the aforementioned parties title to all community property as herein defined shall immediately vest in fee simple in the survivor of them.
Later, the Bachmeiers experienced marital problems. On May 2, 1995, John Bachmeier wrote an unsent letter "[t]o [w]hom it may concern" expressing that on January 1, 1996 he would "sever [his] ties with Angie." Clerk's Papers at 24, 25. He stated he would give Angeline Bachmeier the house and a Lincoln automobile, keep a motor home and a Ford automobile, retain his pension, and allow Angeline Bachmeier to "do as she pleases with the rest." Clerk's Papers at 24. He saw "no recourse but to do this" and no way of "going on this way the rest of the short time that [he has] on this earth." Clerk's Papers at 24.
Although John Bachmeier did not sever his ties with Angeline Bachmeier on January 1, 1996, he left the family home in February 1998. At that time, he filed a petition for legal separation and requested a division of the parties' accumulated property.
On July 18, 1998, while the parties remained separated, Angeline Bachmeier executed a will naming her daughter, Sandra L. Johnson, personal representative, and bequeathing to Johnson the entirety of her estate. Angeline Bachmeier left nothing to her other six children, except as contingent beneficiaries, and expressly left nothing to John Bachmeier, citing "various and sundry reasons" for the disinheritance. Appellant's Br., Appendix C, at page 3.
Two days after executing the will, Angeline Bachmeier died. Johnson petitioned for orders admitting the will to probate and appointing herself as personal representative. John Bachmeier moved to dismiss the petition or, alternatively, for orders appointing him as personal representative and declaring that upon Angeline Bachmeier's death all of her property had become his under the community property agreement. The court admitted the will to probate but appointed John Bachmeier personal representative.
On December 30, 1998, Johnson petitioned for a ruling either that John and Angeline Bachmeier had revoked the community property agreement or that the agreement had terminated as a matter of law when their *501 marriage became defunct. Concluding that the community property agreement was neither revoked nor terminated, the trial court dismissed Johnson's petition.
Johnson sought direct review from the Supreme Court, contending that the issue of whether the community property agreement's testamentary prong terminated by implication when the marriage became defunct was a fundamental issue of broad public import.[1] The Supreme Court declined review and transferred the case to our court.

ANALYSIS

Termination by Implication
The central issue is whether the testamentary prong of the Bachmeiers' community property agreement terminated by implication when their marriage became defunct.
RCW 26.16.120 allows a husband and wife to make an agreement designating all of their property as community property and vesting complete title in the property to one spouse upon the death of the other. The statute is silent on the issue of revocation, however. Despite this statutory silence, our courts have recognized two instances in which a valid community property agreement ceases to operate. First, a community property agreement is a contract, so the parties may rescind it by mutual assent. Higgins v. Stafford, 123 Wash.2d 160, 166, 866 P.2d 31 (1994). Second, a community property agreement is necessarily rendered inoperable by a final divorce decree. In Re Estate of Lyman, 7 Wash.App. 945, 950-51, 503 P.2d 1127 (1972), opinion adopted, 82 Wash.2d 693, 512 P.2d 1093 (1973). Here, neither situation presents itself. Johnson argues, however, that we should recognize a third way to terminate a valid community property agreement-namely, that a community property agreement terminates by implication upon the permanent separation of spouses.
This approach is advocated in a law review article written by Professor William Oltman. See William Oltman, The Implied Termination of Community Property Agreements Upon Permanent Separation, 14 U. PUGET SOUND L.REV. 53 (1990). Professor Oltman first observes that community property agreements rarely contain terms dealing with revocation of the agreement. He notes that this does not pose a problem in terms of dissolution, because the statutory community property agreement is available only to a husband and wife, and therefore terminates by definition upon dissolution. But in a closely analogous situation, the law provides no guidance for spouses who have a community property agreement and, while not divorced, are permanently separated and living "separate and apart" in a defunct marriage. The commentator notes that such spouses are "left in a state of legal limbo[,]" whereby the community is severed, but the community property agreement remains. Oltman, 14 U. PUGET SOUND L.REV. at 56.
Professor Oltman argues that in this situation the law should imply a term that would terminate the agreement upon the spouses' permanent separation. The crux of Professor Oltman's argument is that this is the result most parties would reasonably expect, and had the issue been brought to their attention when making the agreement, it would be the outcome most parties desired. This analysis is logical and compelling:
At the time spouses execute a community property agreement (whether it applies to existing property, future acquisitions, or at-death distribution), it is premised to a large extent upon the existence of the underlying joint venture aspect of their marriage. It is certainly possible that the parties could agree to the conversion of all separate property to community property and the distribution of community property to the survivor upon the death of the first to die while they are permanently separated, but it is very unlikely that they would do so. It would seem almost certain that the provisions in the agreement dealing with property conversions and distributions are dependent upon an ongoing marriage, a relationship in which the product of each person's efforts is shared equally. As has been discussed above, that is simply not the case when there has been a permanent separation. Therefore, it *502 seems consistent to imply a term which terminates the agreement once one of the primary bases for the agreement is lost.
Oltman, 14 U. PUGET SOUND L.REV. at 66.
Nevertheless, we previously rejected a request to imply a termination clause into a community property agreement. In re Estate of Catto, 88 Wash.App. 522, 944 P.2d 1052 (1997), review denied, 134 Wash.2d 1017, 958 P.2d 313 (1998). The parties in Catto made a community property agreement and separated three years later. Soon after that, the wife executed a new will leaving nothing to her husband. About a week later, the wife filed for dissolution of the marriage and died the next day. We declined to imply a clause terminating the testamentary provision of the community property agreement when the marriage became defunct, reasoning:
[T]he Agreement contains no express clause terminating the effectiveness of the agreement after the marriage becomes defunct. In addition, such a provision cannot be implied from the language of the Agreement itself because its operative terms are not logically inconsistent with the existence of a defunct marriage. [Appellant] argues that a termination clause can fairly be implied from the context in which the Agreement was entered. This argument is based on [Appellant's] belief that a husband and wife entering such an agreement would rarely, if ever, have intent that the agreement remain effective after the parties separate. Although such an intent may be rare, we find it apparent that there are a variety of circumstances in which a person has separated from a spouse but still intends that the spouse receive the community property at death. Therefore, because it is conceivable that the parties intentionally omitted a termination clause frequently found in community property agreements, we refuse to imply the existence of such a clause.
Estate of Catto, 88 Wash.App. at 529, 944 P.2d 1052.
Johnson argues that Catto is distinguishable in two ways. First, Johnson asserts that Catto is inapplicable because it involved a one-prong community property agreement, whereas the Bachmeiers' community property agreement is three-pronged. Other than noting this difference, however, Johnson does not explain why this distinction requires a different analysis than that employed in Catto. Further, only the testamentary prong of the Bachmeiers' community property agreement is at issue here, not the conversion prong. As such, Catto is on point and renders this distinction unpersuasive.
Next, Johnson asserts that the Bachmeiers' inclusion of "love and affection" language in their agreement distinguishes this case from Catto. Appellant's Brief at 19. She notes that the court in Catto did not have occasion to consider the effect of such language and she contends that the inclusion of such language makes a more compelling case for implying a termination clause. Specifically, she argues that the presence of love and affection between the parties is a condition of the agreement's continued existence and that those feelings were absent once the parties permanently separated.
In positing this argument, Johnson urges us to analyze the propriety of implying a termination clause under the standard enunciated in Tiegs v. Boise Cascade Corp., 83 Wash.App. 411, 922 P.2d 115 (1996), aff'd, 135 Wash.2d 1, 954 P.2d 877 (1998). The court in Tiegs held that in order for a court to imply an additional covenant to an agreement, the following requirements must be satisfied:
(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.
Tiegs, 83 Wash.App. at 426, 922 P.2d 115 (citing Scott v. Blanchet High Sch. ., 50 Wash.App. 37, 46, 747 P.2d 1124 (1987) (quoting Fuller Mkt. Basket, Inc. v. Gillingham & Jones, Inc., 14 Wash.App. 128, 134, 539 P.2d *503 868, review denied, 86 Wash.2d 1004 (1975)), review denied, 110 Wash.2d 1016 (1988)).
Bachmeier also argues that the Tiegs' standard applies here. But Tiegs' applicability is doubtful, as Johnson does not ask us to imply a covenant, but rather to imply a condition on the agreement's continued effectiveness.
In his contracts treatise, Arthur Corbin recognized two instances in which a court will imply terms into agreements. These terms are characterized as implied-in-fact and implied-in-law. Implied-in-fact terms are those that are found by interpretation of a parties' words or conduct. Implied-in-law terms are a pure judicial artifice, wherein the court declares the existence of a legal duty or condition despite the absence of words or conduct of the parties indicating the existence of such a term. 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 561, at 276-77 (1960). The basis for implied-in-law terms has a long tradition and was well-articulated by Lord Watson:
[W]hen the parties to a ... contract ... have not expressed their intentions in a particular event, but have left these to implication, a Court of Law, in order to ascertain the implied meaning of the contract, must assume that the parties intended to stipulate for that which is fair and reasonable, having regard to their mutual interests and to the main objects of the contract.... [W]hen one ... of these [unforeseen] possibilities becomes a fact, the meaning of the contract must be taken to be, not what the parties did intend (for they had neither thought nor intention regarding it), but that which the parties, as fair and reasonable men, would presumably have agreed upon[.]
Dahl v. Nelson, Donkin, & Co., 6 App. Cas. 38, 59 (1881).[2]
It follows then that an otherwise reasonable implication should not be made when the contrary is indicated in clear and express words or even when the contrary can simply be inferred from the parties' conduct or surrounding circumstances. 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 564, at 298 (1960). Courts will always give effect to the contracting parties' legitimate and lawful intent, whether divined through the parties' express contractual language or implied from the parties' conduct. Berg v. Hudesman, 115 Wash.2d 657, 663, 801 P.2d 222 (1990). Implied-in-law analysis is only applicable when there is no indication from the contract language, the parties' conduct, or the surrounding circumstances that the parties reached agreement on the issue that has arisen. See 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 564.
The Tiegs' analysis interferes with a court's ability to conduct an implied-in-law analysis and conflates the implied-in-fact and implied-in-law concepts. The first, second, and fifth elements state the implied-in-fact test; the third and fourth elements mimic the implied-in-law test. Whereas satisfaction of either implied-in-law or implied-in-fact tests traditionally sufficed to allow the implication of a term into an agreement, a court employing Tiegs must find both tests satisfied before implying a term. This has the practical effect of eliminating the court's authority to imply a term by law because under the Tiegs' analysis, the parties contemplated the term sought to be implied.
*504 The point of implied-in-law analysisas Tiegs' fourth requirement exemplifiesis that the parties never thought about the issue, but if they had they would have agreed to the term sought to be implied. Tiegs never explicitly states that an implied-in-law analysis is improper in Washington; yet, the practical effect of Tiegs standard yields just this result.
Thus, we decline to follow Tiegs here and instead hold that terms in a contract can be implied either in-fact or in-law. This principle is recognized by the Restatement (Second) of Contracts § 226 (1981), which states, "An event may be made a condition either by the agreement of the parties [implied-in-fact] or by a term supplied by the court [implied-in-law]." Thus, we analyze whether to imply a termination clause into the Bachmeiers' community property agreement under this framework.

Implied-in-Fact
When analyzing the propriety of implying a termination clause, the first step is to determine whether, despite the absence of an express clause dealing with this situation, the parties nevertheless reached agreement on this issue. To decide this, we look to the parties' conduct and surrounding circumstances, as well as the contractual language. Ross v. Raymer, 32 Wash.2d 128, 137, 201 P.2d 129 (1948); see also RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981).
Johnson contends that an actual agreement on termination is discernible from the parties' use of "love and affection" language in the agreement. Appellant's Brief at 13. She argues that it can be inferred from this language that the agreement was conditioned upon the continued existence of these emotions. Upon the parties' permanent separation the emotions no longer existed, thereby terminating the agreement.
To imply from the community property agreement's "love and affection" language that the parties considered and agreed that the community property agreement would terminate upon permanent separation is too much of a stretch. The language is not the product of considered negotiation, but rather part of a printed standard form agreement purchased from a store. Additionally, the "love and affection" language appears in the recital portion of the agreement and not the operative part.
No other evidence is cited by either party that the Bachmeiers considered the issue the agreement's continued effectiveness upon permanent separation. Without more, we cannot, via an implied-in-fact analysis, determine that the Bachmeiers agreed to terminate the community property agreement in this situation.

Implied-in-Law
Next, we determine whether it is appropriate to imply a term by law. "When the parties have omitted a term that is essential to a determination of their rights and duties, the court may supply a term which is reasonable in the circumstances." RESTATEMENT (SECOND) OF CONTRACTS § 226, comment c; see also RESTATEMENT (SECOND) OF CONTRACTS § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").
Comment b to Restatement (Second) of Contracts § 204 illuminates how omission occurs:
The parties to an agreement may entirely fail to foresee the situation which later arises and gives rise to a dispute; they then have no expectations with respect to that situation, and a search for their meaning with respect to it is fruitless. Or they may have expectations but fail to manifest them, either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because the discussion of it might be unpleasant or might produce delay or impasse.
Here, as stated earlier, there is no indication that the Bachmeiers ever considered or addressed the issue of the agreement's continued effectiveness if the parties permanently separated. The issue is essential to a determination of the parties' rights and *505 duties, thereby making this an omitted term case.
Comment d to Restatement (Second) of Contracts § 204 provides guidance on the process of supplying an omitted term:
The process of supplying an omitted term has sometimes been disguised as a literal or a purposive reading of contract language directed to a situation other than the situation that arises. Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances. But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.
Accordingly, we imply a termination clause by operation of law. Both the community standards of fairness and the reasonable expectations of parties in such a situation support the implication of such a term. This court in Catto acknowledged that only rarely would spouses intend to maintain the effectiveness of a community property agreement after permanent separation. Having reconsidered the question under an implied-in-law analysis, we believe that it is reasonable to imply a condition that terminates the testamentary prong of the agreement upon the parties' permanent separation.
To do so, however, requires revisiting Catto. In doing so, we first note that the dissent correctly acknowledged:
[a]s this case well illustrates, the community property agreement ... can be an insidious instrument if the parties fail to state how it can be revoked. The problem warrants attention from the Legislature, the Supreme Court, or both.
Catto, 88 Wash.App. at 531, 944 P.2d 1052.
In Catto, this court held that because it was not inconceivable that the parties intended the CPA to remain effective even though the marriage was defunct, the court would refuse to imply a termination clause. In revisiting Catto, we see that its approach is flawed. When there is no indication from the contract, the parties' conduct, or the surrounding circumstances that the parties considered or agreed upon an issue that is essential to a determination of their rights and duties, the court has a duty to supply a term that is reasonable under the circumstances. RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981).
Catto acknowledged that spouses would rarely intend for the agreement to remain effective after permanent separation. Upon this determination, the court should have implied a termination clause, as it was the reasonable thing to do, i.e., it was the result most parties would have anticipated and desired had the issue been called to their attention at the time they entered into the contract.

Defunct Marriage
Johnson next contends that the trial court erred in failing to find that the Bachmeiers' marriage was defunct. A marriage is considered "defunct" when both parties to the marriage no longer have the will to continue the marital relationship. In other words, when the deserted spouse accepts the futility of hope for restoration of a normal marital relationship or just acquiesces in the separation, the marriage is defunct. Seizer v. Sessions, 132 Wash.2d 642, 658, 940 P.2d 261 (1997).
Implicit in Johnson's termination argument is that the Bachmeiers were permanently separated, i.e., their marriage was defunct. The trial court, however, did not deem it necessary to determine whether the marriage was defunct, concluding that under Catto the law did not support Johnson's termination argument even if the marriage was defunct. Johnson asserts concern that the trial court's failure to find that the marriage was defunct "constitutes an implied negative finding" on the issue. Appellant's Brief at *506 20. Yet, the trial court's silence is not a conclusion that the marriage was not defunct, nor is it reversible error. The determination of whether a marriage is defunct is a question of fact. Nuss v. Nuss, 65 Wash.App. 334, 346, 828 P.2d 627 (1992). Thus, on remand, the trial court must determine whether the Bachmeiers' marriage was defunct.
Reversed and remanded for further proceedings.
We concur: MORGAN, P.J., and SEINFELD, J.
NOTES
[1] On appeal, she abandoned her argument that the parties mutually revoked the agreement.
[2] Courts have long recognized the efficacy of implying contract terms:

Supposing a contract to have been duly formed, what is its result? An obligation has been created between the contracting parties, by which rights are conferred upon the one and duties are imposed upon the other, partly stipulated for in the agreement, but partly also implied by law, which, as Bentham observes, "has thus in every country supplied the shortsightedness of individuals, by doing for them what they would have done for themselves, if their imagination had anticipated the course of nature."
THOMAS ERSKINE HOLLAND, THE ELEMENTS OF JURISPRUDENCE 278 (10th ed.1906). "You can always imply a condition in a contract. But why do you imply it? It is because of some belief as to the practice of the community or of a class, or because of some opinion as to policy, or, in short, because of some attitude of yours upon a matter not capable of exact quantitative measurement, and therefore not capable of founding exact logical conclusions." Justice Oliver Wendell Holmes, The Path of the Law, 10 HARV. L.REV. 457, 466 (1897).